

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-16-00134-CV

---

RETIRE HAPPY, L.L.C., APPELLANT

V.

KAREN TANNER, INDIVIDUALLY AND AS EXECUTRIX FOR THE ESTATE OF
EDWIN ALBERT TANNER, APPELLEE

---

On Appeal from the 222nd District Court
Oldham County, Texas
Trial Court No. OCI-15D-019, Honorable Roland Saul, Presiding

---

January 27, 2017

## MEMORANDUM OPINION

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.[1]

This appeal arises from an order denying the special appearance of Retire Happy, L.L.C. Retire Happy asserts that the trial court had no personal jurisdiction over it and, consequently, erred in entering the order that it did. We reverse.

*Authority*

We begin our analysis by mentioning the pertinent standard of review. Whether a trial court has personal jurisdiction over an individual is a question of law and,

---

[1] Justice Mackey K. Hancock, retired, not participating.

therefore, reviewed de novo. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 70 n.8 (Tex. 2016); *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 n.4 (Tex. 2016). And while special appearance litigation implicates shifting burdens and the like, *see Kelly v. Gen. Interior Constr., Inc.,* 301 S.W.3d 653, 658 (Tex. 2010) (discussing the respective burdens placed on the litigants), they are unimportant to our analysis here. Instead, we focus on the ultimate question as recently explained by our Supreme Court in *Cornerstone.*

Personal jurisdiction over a nonresident exists when the Texas long-arm statute authorizes it and the exercise of it comports with due process. *See Cornerstone Healthcare Grp.*, 493 S.W.3d at 70. It is the limitations implicit in due process that guide our analysis. *See id.* Those limitations mandate not only that minimum contacts exist between the defendant and our State but also that the exercise of jurisdiction avoids offending traditional notions of fair play and substantial justice. *See id.*

As for minimum contacts, they are judged or tested against the standard of purposeful availment. *See id.* That is, minimum contacts arise when the defendant purposefully avails himself of the privilege of conducting activities in forum state and thereby invokes the benefits and protections of the forum's laws. *Id.* Assessing whether that transpired entails consideration of (1) only the defendant's contacts with the forum, as opposed to those of the plaintiff or some third party, (2) whether the contacts are purposeful, as opposed to random, isolated, or fortuitous, and (3) whether the defendant sought some benefit, advantage, or profit by availing himself of the jurisdiction. *See id.* at 70–71.

Next, the contacts of which we speak can be viewed as creating two types of personal or *in personam* jurisdiction. One is specific in nature and involves the relationship between the cause of action and the defendant's contacts with Texas. That is, the focus lies upon the relationship between the defendant, the forum, and the litigation. *TV Azteca*, 490 S.W.3d at 42 (quoting *Walden v. Fiore*, 571 U.S. ___, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014)); *My Vacation Eur., Inc v. Sigel*, No. 05-14-00435-CV, 2015 Tex. App. LEXIS 667, at *6–7 (Tex. App.—Dallas Jan. 26, 2015, no pet.) (mem. op.). And, the test used contains two components. Not only must there be evidence of purposeful availment, but also a nexus must exist between the contacts evincing purposeful availment and the plaintiff's claim. *See TV Azteca*, 490 S.W.3d at 37, 52. As said in *Azteca*, "[f]or specific-jurisdiction purposes, purposeful availment has no jurisdictional relevance unless the defendant's liability arises from or relates to the forum contacts." *Id.* at 52. So, even if there is purposeful availment, specific jurisdiction does not exist unless the defendant's liability arises from its contacts with the forum. *See My Vacation,* 2015 Tex. App. LEXIS 667, at *6–7 (stating that "[i]f we conclude a nonresident defendant has made minimum contacts with Texas by purposefully availing itself of the privilege of conducting activities here, then we address whether the defendant's alleged liability arises out of or is related to those contacts").

Next, to satisfy the purposeful-availment prong, the evidence must illustrate not only that the aforementioned contacts existed but also that the defendant's contacts were purposefully directed to the forum state. *TV Azteca*, 490 S.W.3d at 38. Consequently, the defendant's contacts with the forum itself are paramount, not the defendant's contacts with the plaintiff who resides in the forum. *See id.* at 42.

3

As for determining the existence of the requisite nexus between the minimum contacts and the claim, proof "that the plaintiff would have no claim 'but for' the contacts, or that the contacts were a 'proximate cause' of the liability" is unnecessary. *Id.* at 52–53. Instead, we look to the substance of the claim, whether the defendant's contacts with the forum will be the focus of the trial and consume most if not all the litigation's attention, and whether those contacts relate to the operative facts of the claim. *See id.* at 53.

The other manner to gain jurisdiction is more general in nature. There, we see if the minimum contacts with the forum were sufficiently continuous and systematic so as to render the defendant at home in the forum irrespective of the interrelationship between the claim and contacts. *Cornerstone Healthcare Grp.*, 493 S.W.3d at 71. This mode of gaining jurisdiction over a nonresident defendant entails a more demanding analysis of the minimum contacts than that applicable to specific jurisdiction and has a "'substantially higher' threshold." *PHC-Minden, L.P. v. Kimberly-Clark Corp.,* 235 S.W.3d 163, 168 (Tex. 2007) (quoting 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (3d ed. 2007)). Normally, the nonresident must be engaged in long-standing business within the forum, such as through marketing or shipping products to it, performing services in it, or maintaining one or more offices there. *Id.* Less extensive activities will not qualify for general *in personam* jurisdiction. *Id.* Moreover, the contacts weighed are those occurring within a reasonable time before the suit was filed, and are not simply those related to or from which the claim arose. *See id.* at 170.

*Application of Authority to Record*

Karen Tanner, individually and as the executor of the estate of her late husband (Edwin Albert Tanner), sued Retire Happy for breach of fiduciary duty, negligent misrepresentation, fraud, conversion, negligence, promissory estoppel, *quantum meruit*, and violation of the Texas Securities Act.  Allegedly, Retire Happy, a Nevada limited liability corporation, induced Edwin Tanner, a Texas resident, to invest funds with another Nevada corporation known as the Horizon Group.  The investment was not fruitful and resulted in Tanner initiating suit against Retire Happy in Oldham County, Texas.

The allegations appearing in Tanner's live pleading and allegedly vesting the trial court with personal jurisdiction over Retire Happy consisted of the following:

> Defendant Retire Happy, LLC has or has had more than twenty clients who reside or resided in the state of Texas from March 1, 2012 through the present[;]

> Defendant Retire Happy, LLC maintains a toll free (888) number that allows its clients from Texas to call them free of long distance charges[; and]

> Defendant[] directly or indirectly market[s] and sell[s] [its] services in Texas.

Accompanying these statements was the averment that "Plaintiff would also show that the cause of action arose from or relates to the contacts of Defendant[] to the state of Texas, thereby conferring *specific jurisdiction* with respect to defendant[]."  (Emphasis added).

Despite Tanner's mention of "specific" jurisdiction as opposed to both specific and general *in personam* jurisdiction, Retire Happy filed its special appearance addressing both.  To support its contentions, it attached to the pleading both an affidavit from its chief executive officer and documentary evidence.  Via the affidavit, we were

5

told the company (1) was "a Nevada Limited Liability Company, and is not a resident of Texas"; (2) did "not maintain a place of business, a mailing address, a phone number or an office in Texas"; (3) was "not required to maintain a registered agent for service in Texas"; (4) "does not have, nor has it had, any attorneys, agents, brokers, representatives, employees or servants in Texas," other than the one hired to represent it in this suit; (5) "never paid taxes in Texas"; (6) "never owned or controlled any real or personal property in Texas"; (7) "does not own or operate any vehicle in Texas"; 8) "has neither been sued nor has it been involved in any type of litigation or claim brought against it in Texas," other than this suit; (8) "has not utilized the protection of any court in Texas"; (9) "does not have, nor has it had, any employee, officer or director that has attended any trade show, seminar or convention in Texas"; (10) "has not had any employee, officer or director make any business trip to Texas"; (11) "does not own or maintain any bank account in Texas or through a representative in Texas"; and (12) "has not recruited Texas residents for employment inside or outside Texas."

Accompanying the affidavit are a myriad of unauthenticated documents purporting to illustrate contractual relationships and transactions between Edwin Tanner and various entities having addresses outside Texas. Mention is made of business deals involving realty in Florida; wiring instructions from an account held by a bank in New Mexico; the execution by a supposed Nevada corporation named Horizon Group of a promissory note made payable to "Double T, LLC, Solo K FBO, Edwin Albert Tanner";[2] a security agreement naming a person in Nevada as trustee and allegedly encumbering realty in Florida; language that the enforcement of the security agreement

_____

[2] According to the face of the note, repayment is to be made in Nevada "or at such other place as the holder hereof may designate in writing." Nothing is said of Texas.

6

is governed by the laws of Florida, Nevada and California; another promissory note of Horizon Group executed in favor of Karen Tanner;[3] another security agreement encumbering property in Florida and governed by the laws of Florida, Nevada and California; and emails from the supposed CFO of Retire Happy in Nevada to various people.

Tanner responded to the special appearance with her own affidavit, answers to interrogatories, and unauthenticated documents, contracts, emails, and the like. Many of the latter were duplicates of or similar to those documents Retire Happy attached to its special appearance. So too do they purport to show the nature of the business relationships involved.

In her affidavit, Tanner averred that (1) "most communication between [her] husband, [her] and Ben Williams, as an employee of Retire Happy, LLC, was done through electronic mail exchange, [though] some communication and interaction occurred through the telephone while [she] and [her] husband were in Texas"; (2) she and her husband would "[o]n occasion" interact with other Retire Happy employees "by email and telephone"; (3) "[t]he entire exchange of information and business conducted was conducted either through electronic mail, Retire Happy LLC's website, wire transfers, telephone calls, or faxes"; (4) she "never conducted business with Defendants in Nevada"; and (5) she and her husband "were always in Texas when we communicated with Ben Williams or other employees of Retire Happy, LLC."

The interrogatory answers evinced that (1) the "host server" for Retire Happy's website was located in Arizona; (2) Retire Happy had both a toll-free phone number and

---

[3] This note was also payable in Nevada or where the holder designated. Again, nothing is said of Texas.

7

another number having an area code assigned to Las Vegas, Nevada; (3) Retire Happy had a "physical office" only in Nevada; (4) Retire Happy provided services to approximately 600 "clients" between "March 1, 2012 to present"; and (5) of those 600 "clients," twenty-two "reside or resided" in Texas.

The trial court also convened a hearing on the special appearance. Yet, no evidence was offered at the proceeding. Rather, legal counsel simply proffered unsworn argument while alluding to various of the documents appended to the special appearance or response thereto. Needless to say, their unsworn argument is not evidence. *See Reyes v. Thrifty Motors, Inc.*, No. 01-15-00699-CV, 2016 Tex. App. LEXIS 6998, at *9 (Tex. App.—Houston [1st Dist.] June 30, 2016, no pet.) (mem. op.) (holding that unsworn argument of legal counsel is not competent evidence); *Tex. Dep't of Public Safety v. Wiggins*, 688 S.W.2d 227, 230 (Tex. App.—El Paso 1985, no writ) (same).[4]

*Specific Jurisdiction*

With the foregoing information in mind, we begin our analysis by assessing the existence of specific jurisdiction and, in particular, its purposeful-availment prong. As depicted by our description of the evidence above, Retire Happy has little physical or business presence in Texas, aside from the twenty-two "clients" who "reside or resided" in Texas at one time or another. Those twenty-two comprise a mere 3.6% of its entire clientele of 600. Furthermore, the nature and extent of the services provided those

---

[4] The same is no less true of unsworn comments appearing in a brief or motion. *See In re Jane Doe 4*, 19 S.W.3d 322, 326 n.3 (Tex. 2000); *see also State v. Jolly*, 446 S.W.3d 613, 616–17 (Tex. App.—Amarillo 2014, no pet.). For instance, Tanner's statement that "[o]n or about May 22, 2012, Defendant Retire Happy, LLC ("Retire Happy" or "Defendant"), by and through its employee Ben Williams, contacted Albert Tanner regarding various investments" is not evidence simply because it appeared in her response to Retire Happy's special appearance under the moniker "Factual Background." Nor did it become competent evidence because she cited to it as part of the clerk's record.

"clients" went unmentioned in the record, as did the duration of the relationship. How that 3.6% came to know of Retire Happy is equally undeveloped, as is the income generated by Retire Happy from its "clients" in Texas. Whether the business generated by that 3.6% is extensive or nominal could have been influential. *See Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 596 (5th Cir. 1999) (finding no basis for exercising general personal jurisdiction when there was no evidence regarding, *inter alia*, how much business was generated by advertising in Texas nor amount of business generated for hotels by Texas tourist companies); *M.G.M. Grand Hotel v. Castro*, 8 S.W.3d 403, 412 (Tex. App.—Corpus Christi 1999, no pet.) (finding no basis for general personal jurisdiction when plaintiff's assertions were "vague, overly general, and [gave] no indication of the extent, duration, or frequency of MGM's business dealings in Texas," such as "the amount of business [Texas tourist] companies have generated for [the nonresident defendant]").[5] Also, it may have been informative to know whether the "clients" came to Texas after associating with Retire Happy or lived in this State when first coming into contact with them. Yet, knowing that twenty-two of 600 "clients" "reside" or "resided" in Texas at one time or another is alone little indication of the extent of Retire Happy's contacts with the forum.

Similarly missing from the record is evidence illustrating how either Tanner or her husband came in contact with Retire Happy. It does appear, though, that any and all interaction by her and him with Retire Happy occurred through email, the telephone,

---

[5] We are aware that both *Gardemal* and *Westin Hotel* involve general as opposed to specific jurisdiction. We find them helpful, nonetheless. As previously mentioned, the Supreme Court in *TV Azteca* said that the analysis used in determining specific jurisdiction looks to the defendant's contacts with the forum state itself, not the defendant's contacts with the persons who reside there. *See TV Azteca*, 490 S.W.3d at 42. Arguably, the amount of income generated by a defendant throughout the forum state may be useful in determining the extent of a defendant's contacts with the forum state.

9

and a website. Yet, changes in technology have rendered telephone calls obsolete proof of purposeful availment. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 791 (Tex. 2005) (stating that "changes in technology have made reliance on phone calls obsolete as proof of purposeful availment."). The use of email also falls within that realm. *Furtek & Assocs., L.L.C. v. Maxus Healthcare Partners, L.L.C.*, No. 02-15-00309-CV, 2016 Tex. App. LEXIS 4192, at *13 (Tex. App.—Fort Worth Apr. 21, 2016, no pet.) (mem. op.) (stating that "Texas courts have consistently held that telephone calls, emails, and mail between a nonresident defendant and a Texas resident are insufficient minimum contacts to establish specific jurisdiction" and such "communications are insufficient to confer specific jurisdiction over nonresident defendants who use phones, computers or mail to do business with Texas residents"); *KC Smash 01, LLC. v. Gerdes, Hedrichson, Ltd., LLP*, 384 S.W.3d 389, 393–94 (Tex. App.—Dallas 2012, no pet.) (holding that communications through email and telephone and sending payments to the forum did not demonstrate purposeful availment). So too is evidence that information was exchanged via facsimile or fax machine insufficient. *Alenia Spazio, S.P.A. v. Reid,* 130 S.W.3d 201, 213 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (stating that "numerous telephone and facsimile communications with people in Texas relating to an alleged contract do not establish minimum contacts"). The reason behind this is that "jurisdiction should not be determined by the fortuitous location of the Texas resident when the nonresident defendant communicates with them." *Furtek & Assocs.*, 2016 Tex. App. LEXIS 4192, at *14.

Tanner does make much of the presence of Retire Happy on the worldwide web, though. Because the website is "interactive," in her view, that illustrates purposeful

availment. Such an all-encompassing suggestion, however, is not something we can accept. It is true that sister courts have addressed situations wherein websites were considered in determining the existence of personal jurisdiction over the website owner. And, often those cases discuss whether the sites were passive (i.e., informational and used only for purposes of advertising) or interactive (i.e., clearly used for transacting business like executing contracts and selling goods). *See My Vacation*, 2015 Tex. App. LEXIS 667, at *13–15; *see also Gray, Ritter, & Graham, PC v. Goldman Phipps PLLC*, No. 13-14-00310-CV, 2015 Tex. App. LEXIS 10385, at *60–62 (Tex. App.—Corpus Christi Oct. 8, 2015, pet. denied) (discussing the same).[6] In our view, though, a website's passivity or interactivity alone does not necessarily suggest purposeful availment. Again, our Supreme Court in *TV Azteca* said that the defendant's contacts must be purposefully directed to the forum state before they satisfy the test. *See TV Azteca*, 490 S.W.3d at 38. Random, isolated and fortuitous contacts are not enough. *Id.* The presence of a website alone (irrespective of whether it is active or passive) says little about whether its owner purposefully directed it at any particular state. That a person in Texas may come upon and utilize an active website does not provide a

_____

[6] As described in *My Vacation*,

Internet use falls within three categories on a sliding scale for purposes of establishing personal jurisdiction. At one end of the sliding scale are websites that are "clearly used for transacting business over the Internet," such as entering into contracts, sales of goods and products, and the knowing and repeated transmission of files of information. These websites may be sufficient to establish minimum contacts with a state. On the other end of the scale are "passive" or "informational" websites that are used only for purposes such as advertising, and "are not sufficient to establish minimum contacts even though they are accessible to residents of a particular state." Between the extremes of the scale are "interactive" websites that allow for some "exchange of information between a potential customer and a host computer." Courts evaluate the middle ground contacts based on the level of interactivity (the degree of interaction between the parties) and the commercial nature of the exchange of information.

*My Vacation,* 2015 Tex. App. LEXIS 667, at *13–14 (citations omitted).

11

foundation upon which to reasonably infer that the website owner intended to service or sell products to people in that State. In the era of electronic communication and trade, location is often no more than happenstance or fortuitousness. All one needs is the internet to access any public site, and the internet can be accessed most everywhere. It matters not where one is. Indeed, one could liken the act of operating a website to placing goods into a stream of commerce.

Placing a product into the stream of commerce with the expectation that it will be sold in the forum state may subject the manufacturer to personal jurisdiction in that forum. *See TV Azteca*, 490 S.W.3d at 46. Yet, mere knowledge that the product will be sold in the forum is not enough. *See id.* As acknowledged in *TV Azteca,* a seller knowing that the stream of commerce may or will sweep his product into a forum is not tantamount to purposeful availment of that forum. *See id.* Rather, "additional conduct" is needed to demonstrate that the seller had the intent or purpose to serve the market in the forum. *Id.* The need for additional conduct evincing such a purpose seems to be what the court in *My Vacation* relied on when concluding that no personal jurisdiction existed over My Vacation. It stated that "[e]ven if MVE's website were 'very interactive,' this would be but one factor to consider in determining whether general jurisdiction exists." *My Vacation*, 2015 Tex. App. LEXIS 667, at *15. "Although it markets apartments via its website, MVE does not ship products to Texas, does not perform any services in Texas, and does not *target* Texas residents." *Id.* (emphasis added).

Evidence of a website (irrespective of whether it is interactive) simply illustrates the potential for activity from the forum in question and the website owner's knowledge of that potentiality. It does not illustrate actual use or its extent. In short, there needs to

12

be more than the existence of a website (whether interactive or not) to support an inference that the forum was targeted by the website owner or that the latter directed its marketing efforts at the forum. *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576 (Tex. 2007) (stating that a nonresident defendant that *directs* marketing efforts to Texas in the hope of soliciting sales may be subject to suit in Texas for alleged liability arising from or relating to that business). And, the additional evidence or conduct is missing here.

Again, twenty-two of Retire Happy's 600 "clients" were in Texas at some point. That means that 578 or 96.4% were not. Whether those twenty-two provided Retire Happy with any substantive business or income is left to our speculation. Simply throwing out a number of customers means little unless placed in context. They may provide it 99.99% of its business or .01%. Moreover, it is quite difficult to infer that Retire Happy had the intent to serve the Texas market or directed its marketing efforts at Texas when 96.4% of its clientele reside or resided outside the State. And, it is only speculation to suggest that Retire Happy obtained any of those twenty-two clients who "reside or resided" in Texas via its website or internet, given the record before us.

Nor do we have any idea of how many people access its website on any given day, how many are from Texas, or whether they utilize it for anything other than informational purposes. Nor do we know if Retire Happy structured its website or any other marketing effort in some way to target people in Texas, as opposed to residents of this nation's other forty-nine states and the other innumerable nations and countries on this earth wherein people have internet access. It is conceivable to suggest that the

13

company should have reasonably known that someone in Texas could access its site, but more is needed than that if the lessons of *TV Azteca* are to be heeded.

Phone calls, emails and fax messages between Tanner and Retire Happy; twenty-two of 600 "clients" in some form or fashion residing or having resided in the forum at some time or another; and the existence of a website that may be accessed in any state one encounters the internet is not the sufficient additional conduct upon which to reasonably infer an intent to target or direct activities at Texas. Given this and the rather sparse record before us, we cannot conclude that Retire Happy purposefully availed itself of the privilege of conducting activities in the forum. The first prong needed to prove specific jurisdiction being unsatisfied, that avenue of gaining personal jurisdiction over the entity is closed to Tanner.

*General Jurisdiction*

Next, we address the allegation that Retire Happy's activity in Texas satisfied the components of general jurisdiction. Again, the minimum contacts must be sufficiently continuous and systematic so as to render the defendant at home in the forum. As for the contacts here, we have no offices, employees or resident agents of Retire Happy in Texas. No one from the entity visited Texas for business purposes. Nor do we have evidence that the investment opportunities allegedly afforded by Retire Happy encompassed realty, personalty, or businesses in Texas. Indeed, they were in Florida. So too does it appear that monies used to fund the investments were transferred from locales outside Texas. Nor we have evidence of any marketing directed at Texas.

Of the entities twenty-two "clients" who "reside or resided" in Texas, we have no information about how or where they were secured. The nature and extent of their

interaction with Retire Happy is also unknown, as is how the entity even communicates with them. To suggest that they or anyone else in Texas (other than the Tanners) utilized the Retire Happy website is also nothing but conjecture.

Simply put, the evidence—when viewed in a light most favorable to the trial courts decision—falls short of illustrating that Retire Happy engaged in or developed a long-standing business within the forum or otherwise maintained continuous and systematic contact with Texas so as to render it at home in the forum. Indeed, we see that noticeably stronger connections with the forum than those here have been deemed insufficient to support general jurisdiction. *See Helicopteros Nacionales De Colombia, S.A. v. Hall*, 466 U.S. 408, 410–11, 417–19, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984) (finding company was not subject to general jurisdiction for lack of "continuous and systematic" contact when company had ventured to Texas, negotiated a contract in Texas, accepted checks drawn on a Texas-based bank, purchased 80% of its helicopter fleet and other equipment from Texas vendors, and had sent pilots and other personnel for training in Texas); *PHC-Minden*, 235 S.W.3d at 170–71 (relying on *Helicopteros* to conclude that nonresident corporation and its wholly owned subsidiary hospital were not subject to general jurisdiction of Texas despite having had contacts with the forum that included having sponsored two staff trips to meetings in Dallas, having paid $1.5 million to Texas-based entities, and having entered into three contracts with Texas-based entities for internet, marketing, and radiological services; "[e]ven when amassed," contacts were not "continuous and systematic general business contacts" that would support general jurisdiction). Consequently, the trial court lacked general *in personam* jurisdiction over the entity.

We reverse the trial court's order denying the special appearance and render judgment dismissing the claims against Retire Happy for want of personal jurisdiction.


Brian Quinn
Chief Justice