In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00265-CV

_____

**GERARD R. JACQUIN, Appellant**

**v.**

**DOSSEY & JONES, PLLC, AND JAMES P. DOSSEY,**
**INDIVIDUALLY AND AS EXECUTOR OF**
**THE ESTATE OF DALE DOSSEY, Appellees**

**On Appeal from the 457th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-08-11783-CV**

**OPINION**

This is an interlocutory appeal from the denial of Appellant Gerard Jacquin's special appearance challenging the trial court's jurisdiction over his person. Jacquin is a French citizen residing in Singapore who was added as a third-party defendant in a Texas lawsuit between a Texas oilman and his Texas lawyers. Whether the trial court has jurisdiction over Jacquin in this case depends on whether Jacquin's alleged

contacts with Texas demonstrate that he purposefully availed himself of the benefits of conducting activities in Texas and whether the claims against him arise from or relate to those contacts with Texas. Because we conclude that Jacquin's contacts are sufficient and that the claims are related to those contacts, we affirm the trial court's denial of his special appearance.

## Factual Background

Plaintiff, Phillippe E. Mulacek, is a petroleum engineer who founded InterOil Corporation in 1995 and served as its chairman and CEO until his retirement in 2013. According to Mulacek's petition, there were three people who were not members of InterOil who nonetheless were "key" members of his team: Carlo Civelli, a financial advisor who managed "substantial assets" for Mulacek and his family; Dale Dossey, who served as Mulacek's personal and tax attorney over the span of twenty years; and, later, Dale's son James Dossey who joined Dale's law firm, Dossey & Jones, PLLC, in 2012.[1] Mulacek, Dale and Jim are Texas citizens, and Mulacek's office is in The Woodlands, next-door to Dossey & Jones's offices.

Because Mulacek spent significant time away from Texas developing InterOil, he relied on Dale to manage several bank and brokerage accounts in Mulacek's absence, giving Dale access to Mulacek's financial records. Dale served

---

[1]We refer to Dale Dossey as "Dale," James Dossey as "Jim," the law firm as "Dossey & Jones," and all of them collectively as "the Dossey Parties."

as president, sole shareholder and a director of PNG Drilling Ventures, Ltd. ("PNGDV"), a Barbados limited company with its primary business office in The Woodlands, Texas. In this role, Dale managed, on behalf of PNGDV's investors a 6.75% interest in "Phase One" and a 5.75% interest in "Phase Two" of InterOil's Exploration Program in Papua New Guinea. In exchange for Dale's services over the years, Mulacek allegedly transferred a "significant amount of [InterOil] stock to Dale's personal accounts" without receiving a reconciliation of the stock against the fees and expenses. Dale was also general partner in Palomero, Ltd., a Texas limited partnership which held a 50% partnership interest in European Energy Partners ("EEP"), a Texas general partnership which had obtained, through a series of transactions, a 1% beneficial interest out of the 6.75% held by PNGDV in Phase One. As a result, Dale had a 0.5% interest in Phase One.

Disputes arose between Mulacek, Dale and Civelli in late 2013 or early 2014. Then in August 2014, Dale was diagnosed with brain cancer. In November 2014, according to the petition, "Dale exited his role in PNGDV and transferred its ownership to companies controlled by [Mulacek's] cousin, Gerard R. Jacquin [] and management to Phil and [Jacquin]." On November 7, 2014, Jacquin acquired Dale's 50% interest in EEP, the Texas general partnership which held a 1% interest in Phase One. Three days later, Jacquin, acting individually, as EEP's general partner and as trustee for EEP's other general partner, sold EEP's interest to Plaintiff, Asian Gas

3

Partners, Ltd. ("AGPL"), a British Virgin Islands limited company for which Jacquin signed as "Authorized Signatory." In light of Dale's condition, Jim signed as Dale's agent, indicating Dale's consent to the transaction which was reduced to writing as "PNGDV IPI Sale, Purchase and Assignment Agreement (European Energy Partners)" ("the EEP SPA"). One of the terms of the EEP SPA provides, "Jacquin directs [AGPL] to pay his share of the Purchase Price to [Dale] for separate consideration received." In early 2015, Jacquin directed AGPL to send Dale $1,250,000, a payment which the Dossey Parties concede was received. However, as of 2021 when this lawsuit was filed, additional payments possibly totaling $3,750,000 were still conditioned on Phase One's meeting certain performance thresholds.

In 2021, Mulacek and AGPL filed suit against Jim, individually and as executor of Dale's estate, and Dossey & Jones. In the petition, Mulacek and AGPL allege Jim improperly disclosed confidential information to Mulacek's financial advisor, Carlos Civelli, with whom Mulacek is involved in litigation in federal court and in Singapore. Among other relief, Mulacek and AGPL ask the trial court to disgorge all previous payments under the EEP SPA and order that no further payments are owed to Dale's estate.

In 2023, the Dossey Parties filed an "Amended Answer, Counterclaim and Third-Party Petition[,]" bringing Jacquin into the case as a third-party defendant.

4

The Dossey Parties' live pleading asserts Mulacek and Jacquin, knowing that Dale was incapacitated with terminal brain cancer, conspired to defraud Dale out of his 0.5% interest, which the Dossey Parties assert was worth at least $19 million.

Jacquin filed a Special Appearance asserting the Dossey Parties did not meet their burden to plead facts sufficient to show Jacquin is subject to the jurisdiction of a Texas court. Attached to the Special Appearance is an October 6, 2022, Unsworn Declaration of Gerard R. Jacquin in which Jacquin swears that he is a French national, that he has resided in Singapore for the last seven years and that he has never "regularly traveled to Texas, had an office in Texas, resided in Texas or conducted business in Texas."

Six weeks before the hearing on Jacquin's Special Appearance, the Dossey Parties filed a Second Amended Answer and First Amended Counterclaim and Third-Party Petition containing allegations they claim are sufficient to show Jacquin is subject to jurisdiction in Texas, including that Jacquin's signatures on the EEP SPA "show that Jacquin purposely availed himself of the privilege of conducting activities in Texas such that he could reasonably expect to be haled into court in Texas." Jacquin did not amend his special appearance nor his unsworn declaration to controvert any of the new jurisdictional allegations. A week before the hearing, the Dossey Parties filed a Response to Third-Party Defendant's Special Appearance, attaching several exhibits, including the documents detailed above and a copy of the

5

transcript of Jacquin's deposition testimony. Jacquin filed a reply, lodging objections to the Dossey Parties' exhibits and arguing the jurisdictional facts included in the Dossey Parties' amended pleading do not suffice to establish jurisdiction.

After a hearing, the trial court signed a written order denying Jacquin's special appearance. Jacquin then filed this interlocutory appeal asserting the trial court erred in denying his special appearance because the court does not have general or specific personal jurisdiction over him.

## Personal Jurisdiction

For any court to render a binding judgment, it must have jurisdiction over both the subject matter and the parties. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 7-8 (Tex. 2021). Subject matter jurisdiction is not disputed in this case, but Jacquin asserts the trial court lacks personal jurisdiction over him. Nonresidents, such as Jacquin, are subject to personal jurisdiction in Texas courts only if such jurisdiction is authorized by statute and only when the exercise of jurisdiction over the nonresident is consistent with the due-process guarantees of the United States Constitution. *Id*.

Known as the "long-arm statute," Chapter 17 of the Texas Civil Practice and Remedies Code provides a framework for Texas courts to serve process on, and exercise personal jurisdiction over, nonresidents who do business in Texas. Section

6

17.042 provides, "In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:

> (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
>
> (2) commits a tort in whole or in part in this state; or
>
> (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

Tex. Civ. Prac. & Rem. Code Ann. § 17.042. But even when a nonresident engages in such activities, a Texas court may not exercise jurisdiction over the nonresident if doing so would violate constitutional due process. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 788 (Tex. 2005). Because the statute broadly includes "other acts that may constitute doing business," the Texas Supreme Court has held, "The broad language of the long-arm statute's 'doing business' requirement permits the statute to reach as far as the federal constitutional requirements of due process will allow." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex. 1991) (internal citation omitted). Consequently, to determine whether a Texas court may exercise personal jurisdiction over a nonresident in a particular case, the court need only determine whether doing so would be "consistent with federal constitutional requirements of due process[.]" *Id.* Constitutional due process is satisfied when the nonresident "ha[s] certain minimum contacts with [Texas] such that the maintenance of the suit

7

[in Texas] does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010).

A nonresident defendant's contacts may support either general personal jurisdiction or specific personal jurisdiction. *See Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). When a nonresident defendant's contacts with Texas are so "'continuous and systematic'" that the defendant is "'essentially at home[]'" in Texas, a Texas court has general jurisdiction over the defendant which allows the court to render a binding judgment against the defendant even when the plaintiff's claims are unrelated to the defendant's contacts in Texas. *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 412 (Tex. 2023) (citations omitted). The Dossey Parties concede in their brief that Jacquin is not subject to general jurisdiction. Accordingly, the question in this case is whether the trial court has specific personal jurisdiction over Jacquin.

A Texas court can exercise specific jurisdiction over a nonresident defendant when two conditions are met: (1) the defendant engages in some act by which it purposefully avails itself of the privilege of conducting activities in Texas, and (2) the plaintiff's claims arise out of or relate to those Texas contacts. *Id*. (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352 (2021); *Luciano v.*

8

*SprayFoamPolymers.com, LLC,* 625 S.W.3d 1, 8-9 (Tex. 2021); *see also Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 579 (Tex. 2007) (specific-jurisdiction analysis involves two co-equal components: purposeful availment and relatedness)).

*Purposeful Availment*

"At its core, the purposeful availment analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there." *Moncrief Oil*, 414 S.W.3d at 152. Focusing on the "quality and nature" of the nonresident's contacts with Texas, we are guided by three principles when analyzing purposeful availment:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person.
>
> Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated.
>
> Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Moki Mac*, 221 S.W.3d at 575 (internal quotation marks and citations omitted); *see also Am. Type Culture Collection v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) ("It is the quality and nature of the defendant's contacts, rather than their number, that is important to the minimum-contacts analysis.").

*Relatedness*

"The 'arise from or relate to' requirement lies at the heart of specific jurisdiction by defining the required nexus between the nonresident defendant, the litigation, and the forum." *Moki Mac*, 221 S.W.3d at 579. "[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation." *Id*. at 585. "'Even a single purposeful contact may be sufficient to meet the requirements of minimum contacts when the cause of action arises from the contact.'" *Michiana*, 168 S.W.3d at 795 (quoting *Micromedia v. Automated Broad. Controls*, 799 F.2d 230, 234 (5th Cir. 1984)).

**Special Appearance**

The Dossey Parties, as third-party plaintiffs, bore "the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Kelly*, 301 S.W.3d at 658. To challenge the court's personal jurisdiction, the nonresident defendant – or in this case, Jacquin, as the nonresident third-party defendant – must file a special appearance before any other pleading or motion. *See* Tex. R. Civ. P. 120a. A special appearance must be supported by affidavit. *Id*. When a plaintiff's petition includes no jurisdictional facts, the defendant may defeat jurisdiction merely by proving he does not reside in Texas. *Kelly,* 301 S.W.3d at 658-59. The plaintiff, however, may amend the petition to

include jurisdictional facts "thereby allowing jurisdiction to be decided based on evidence rather than allegations, as it should be." *Id*. at 659. "Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff." *Id*. at 658.

A defendant may attack the plaintiff's jurisdictional allegations factually, legally or both. *Id*. at 659. Factually, the defendant can present evidence negating the alleged contacts with Texas, thereby shifting the burden back to the plaintiff to respond with evidence to support its jurisdictional allegations. *Id*. "Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction[.]" *Id*.

In this case, the third-party petition bringing Jacquin into the case did not allege any jurisdictional facts because it did not allege Jacquin had any contacts with Texas. Therefore, when Jacquin filed his special appearance, his only burden was to prove he was not a resident of Texas. He did so by attaching an unsworn declaration in which he affirmed he was a French citizen residing in Singapore. *See* Tex. Civ. Prac. & Rem. Code Ann. § 132.001 (permitting unsworn declarations to be used in lieu of affidavits). However, when the Dossey Parties filed their amended third-party petition which included detailed allegations of Jacquin's purported contacts with Texas, Jacquin did not negate those allegations by filing an amended or

11

supplemental affidavit addressing the new allegations nor by amending his special appearance as permitted by Rule 120a. Therefore, the burden never shifted back to the Dossey Parties to present evidence supporting their jurisdictional allegations. Nevertheless, during the hearing on the special appearance, the Dossey Parties introduced evidence consisting of copies of various documents authenticated by Jim's testimony. No other live testimony was introduced by either party. Jacquin introduced only one exhibit, a copy of the August 22, 2000, "Articles of Amendment to the Certificate of Limited Partnership of Palomero, Ltd. A Texas Limited Partnership" identifying Nancy Dossey as Palomero's general partner.

Rule 120a(3) requires a trial court to "determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P. 120a(3). If the trial court grants the special appearance, the nonresident defendant is dismissed from the case, and an ordinary appeal may be filed by the plaintiff. If, as in this case, the trial court denies the special appearance, the nonresident defendant may file an interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7). On appeal we conduct a de novo review of the trial court's ruling, because personal jurisdiction is a question of law. *Am. Type*, 83 S.W.3d at 805-06. The scope of our review includes all evidence in the record. *See Phillips Dev. & Realty, LLC v. LJA Eng'g, Inc.*, 499 S.W.3d 78,

12

85 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Wise v. Nims,* No. 09-95-00214 CV, 1996 Tex. App. LEXIS 4835, at *5 (Tex. App.—Beaumont Oct. 31, 1996, no writ) (not designated for publication). "When the trial court does not issue findings of fact, reviewing courts should presume that the trial court resolved all factual disputes in favor of its judgment. *Am. Type*, 83 S.W.3d at 806. "When the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (citations omitted).

Jacquin challenges both the legal and factual sufficiency of the evidence. In our review of the legal sufficiency of any findings implied by the trial court's denial of Jacquin's special appearance,

> we view all evidence in the light most favorable to the [implied finding], and we overturn [the implied finding] only if there is a complete absence of evidence proving a vital fact, the rules of law or evidence bar the court from weighing the only evidence proving a vital fact, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence conclusively disproves the existence of a vital fact.

*Westwood Motorcars, LLC v. Virtuolotry, LLC*, 689 S.W.3d 879, 885-86 (Tex. 2024) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 810 (Tex. 2005)). In our factual sufficiency review, we "consider and weigh all the evidence," and we set aside the implied finding "only if it is so contrary to the overwhelming weight of the

13

evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

In addition to the exhibits introduced during the hearing we must also consider the pleadings, not only because Rule 120a includes the pleadings among the materials the trial court was required to consider, but also because the "relatedness" prong of our jurisdictional analysis requires us to determine whether Jacquin's contacts in Texas are substantially related to the operative facts of the litigation, a question which can be answered only by considering the pleadings. Additionally, to the extent the Dossey Parties' jurisdictional allegations are not controverted by Jacquin's unsworn declaration, the trial court was entitled to accept those allegations as true since the burden never shifted back to the Dossey Parties to offer evidence supporting their jurisdictional allegations.

## Pleadings and Evidence

In their petition, Mulacek and AGPL claim that in 2003, Mulacek asked Dale to incorporate a drilling fund known as PNG Drilling Ventures, Ltd., (PNGDV), in which investors could capitalize on InterOil's oil and gas exploration in Papua New Guinea. Initially, PNGDV was financed largely by Mulacek and his family, but Mulacek eventually transferred the shares and management control of PNGDV to Dale who, as sole shareholder, director and president, administered the funds on behalf of Mulacek and his family as well as some third-party investors who

14

beneficially owned PNGDV's assets. One of the exhibits admitted during the special appearance hearing is a document entitled, "Sale and Purchase Agreement for all the Shares in the PAC LNG Group Companies" ("the OSL SPA"). The OSL SPA is the written representation of one of the transactions at the center of the litigation between the parties. According to the OSL SPA, as of February 27, 2014, PNGDV's "primary business office" was at the same address as Dale's law office in The Woodlands, Texas.

The EEP SPA, which was also admitted during the special appearance hearing, is another document at the center of the litigation. The EEP SPA reveals that between 2004 and 2006, PNGDV had acquired, on behalf of its investors, indirect participation interests ("IPIs") in InterOil's exploration program in Papua New Guinea, totaling 6.75% for "Phase One" (consisting of the first eight wells) and 5.75% for "Phase Two" (consisting of the next sixteen wells). According to the EEP SPA, each of PNGDV's investors "received a proportionate beneficial interest in the total Initial PNGDV IPI (referred to herein as a 'Net Beneficial Interest')." The document summarizes a series of transactions resulting in EEP's ownership of a 1% net beneficial interest out of the total 6.75% IPI held by PNGDV for Phase One. The document describes EEP as an oral Texas general partnership in which Dale held a 50% general partnership interest, the other 50% being held by a trust known as the Vinson Trust. According to the EEP SPA, Dale eventually transferred his 50%

15

general partnership interest to Palomero, Ltd., a Texas limited partnership in which Dale was the general partner.[2] As a result of the transactions summarized in the EEP SPA, Dale – by virtue of Palomero's 50% interest in EEP – owned a 0.5% net beneficial interest in Phase One of InterOil's exploration program in Papua New Guinea.

Jacquin's involvement in the various transactions at issue begins to become apparent in late 2013. Documents admitted during the special appearance hearing indicate that on December 2, 2013, Mulacek emailed Dale and Jacquin to line up a call. Later that day, Jacquin sent two emails providing his email addresses to Dale, the second of which asks Dale to use Jacquin's personal email address. In response, Dale sent Jacquin the following email wherein he provided recommended language for communicating with Mulacek's financial advisor, Carlo Civelli:

> Hello Gerard. The following is a guide for your communication. You will probably want to change this, and I would also suggest that it be in your native language.
>
> Carlo, I hope you are doing well.
>
> I have learned that you have been involved in negotiations of several alternative transactions involving the possible sale of all or part of the

---

[2]We acknowledge that in August 2000 Palomero filed amended articles naming Nancy Dossey as general partner, but the evidence does not establish the designation was still in effect in 2014 when the transactions in question took place. All other documents identify Dale as Palomero's general partner in 2014. Jacquin's brief describes Palomero as "Dale's entity," and the Dossey Parties likewise refer to Palomero as Dale's limited partnership.

IPI interest. As you will recall, I and my family have a substantial interest in the IPI.

While we greatly appreciate all of your efforts on our behalf, we emphasize to you that you do not have authority to bind us in any transaction. It is likely that we will endorse and accept the final transaction you recommend, but please be advised that our written approval is required.

Please feel free to contact me.

Thank you.

Two days later, on December 4, 2013, Dale sent Jacquin another email in which he recommended additional language for Jacquin to use when communicating his concerns to Civelli, including,

> Please be advised that I and my family do not approve the transaction contemplated, and that as substantial owners of both Aton Select Fund, Ltd. and European Energy Partners Trust, Ltd. we instruct you to not accept or agree to the Term Sheet as presented. We will be very cooperative in considering offers for the purchase of our interest, but we cannot and will not commit to accept a transaction without examining all of the underlying documents and agreements. We do not understand the possible effects of a "binding obligation" to agree to something we have not examined.
>
> It is my information that Mr. Dossey is President of PNG Drilling Ventures, Ltd. I am copying Mr. Dossey with this communication, with our instruction that the Term Sheet not be accepted on our behalf.

Two months later, on February 27, 2014, Dale, acting as president of PNGDV, and Civelli, acting on behalf of three other investment entities, entered into a transaction with an entity known as Oil Search Limited ("OSL") memorialized in a

document entitled, "Sale and Purchase Agreement for all the Shares in the PAC LNG Group Companies" ("the OSL SPA"). In this transaction, PNGDV and the other three entities sold their IPI interests to OSL for an "Initial Cash Purchase Price" of $900 million, with "Additional Cash Purchase Price" payments to be made by OSL upon completion of certain stages of production described in Schedule 3 of the OSL SPA. Pursuant to Schedule 2 of the OSL SPA, each seller's share of each such payment was to be calculated pursuant to a formula based on its pro rata share of the total 22.835% interest being purchased by OSL. According to Mulacek's petition, "PNGDV was due around 30% of the up front and future proceeds (6.75%/22.835%)." According to the Dossey Parties' Second Amended Answer and First Amended Counterclaim/Third-Party Petition, "On information and belief, [Dale's] 0.5% interest distribution is worth, at a minimum, a gross value of around $19 million at the time of the OSL Transaction."[3] The OSL SPA indicates it is to be construed under the laws of England and Wales and requires any dispute to be resolved by arbitration in Singapore under Singapore International Arbitration Centre's rules.

---

[3]We note that 0.5% / 22.835% x $900,000,000 is $19,706,590.80.

One week later, on March 5, 2014, Dale received an email from a French attorney, Matthieu Bringer. Mulacek and Jacquin were copied on Bringer's email, which stated:

> I am a French attorney acting for the Vinson Trust (the "V. Trust"), Commodities Trading International and other investment entities that capitalized PNG Drilling Ventures Ltd., a company incorporated in Barbados ("PNGDV"). I am acting for these entities as well as for various members of the family, including Mr. Gerard Jacquin (A French citizen for whom I have been acting for a long time).
>
> The V. Trust and family are the majority beneficial owners of PNGDV (with 92.2965% of the issued economic interest allocation), which holds a beneficial 6.23% of 6.75% gross interest in the PRL-15 gas/condensate field interest license in Papua New Guinea… [M]y clients have obviously not been involved in this transaction.
>
> More specifically, my clients specifically brought to my attention that PNGDV would be about to transfer 100% of the shares of PAC LNG Assets Limited, a company existing under the laws of Papua New Guinea, to Oil Search Limited. My clients inform me that you currently act as President and as a Director of PNGDV in Barbados which the beneficial owners had arranged with you to be Director/President upon original incorporation of PNGDV. Despite their numerous instructions as ultimate beneficiaries of PNGDV not to sell the PNGDV interest of 6.23%, you have apparently committed to dispose of the aforementioned PAC LNG Assets Limited shares in the coming days. If this is true, please be advised that you are on notice not to sell such interest of PNGDV as it would, according to my clients, amount to a breach of your fiduciary duties to act for their family's interests. You are not to take any further instructions from any third party that would direct you to act otherwise.
>
> . . .

19

Should the Proposed Transactions already have taken place, my clients reserve all their rights against whomever have caused them to happen for losses suffered as a result.

. . .

My clients are currently having the required legal documentation prepared to have you removed of your positions of President and Director of PNGDV so that these matters may be directly dealt with by them as soon as possible.

Finally, I have been asked to warn you that should you fail to abide with all aforementioned requests and instructions, my clients will not hesitate to initiate any legal action that they see fit before any court of competent jurisdiction in order to protect their family's interest in PNGDV or its wholly owned subsidiary in Papua New Guinea PAC LNG Assets Limited. You are notified that failure to adhere to these is likely to cause the family to seek recovery of its full damages from you, among others, personally.

Three days later, on March 8, 2014, Dale received an email from Mulacek, with copies to Jacquin and Bringer, as follows:

Yesterday we had a meeting on PNGDV and covered the family ownership and the 0.5 percent you are to earn from the 6.23 percent ownership by the Vinson trust in PNGDV (majority). In the meeting you said you completed the pay order instructions and sent to Carlo Civelli/ David Dawes and Law firm King Spalding. The Family and owners required A [sic] copy of the drafted documents ASAP.

We honor the 0.5 percent fee so long as the family is protected and you honor your fiduciary and legal responsibility to the family interest. Otherwise the legal liability and damages are your - per Mr. Bringer notice.

On November 7, 2014, eight months after receiving these emails and three months after having been diagnosed with terminal brain cancer, Dale was removed

20

as president, director and sole shareholder of PNGDV. According to the petition, Mulacek and Jacquin were made directors of PNGDV, with Mulacek serving as president and secretary/treasurer, and Jacquin as vice president. All shares in PNGDV, previously held by Dale, were transferred to entities controlled by Jacquin. Also on November 7, 2014, Dale, as general partner of Palomero, Ltd., a Texas Limited Partnership, executed a document entitled, "Written Consent and Assignment of Interest in European Energy Partners" in which Palomero assigned all its interest in EEP to Jacquin.

As a result of the November 7, 2014 transactions, Jacquin acquired a 50% interest and became a general partner in EEP, an oral Texas general partnership. Jacquin also became vice president and one of the directors of PNGDV, a company whose primary business office was in The Woodlands, Texas.

Three days later, on November 10, 2014, Mulacek, Dale and Jacquin (acting individually and in multiple representative capacities) executed the EEP SPA, in which EEP's interest was purchased by AGPL for $10 million. After summarizing the transactions which led to EEP's owning a 1% net beneficial interest of the total 6.75% PNGDV IPI in Phase One, the EEP SPA recites, "Subsequently, [Dale] Dossey transferred his entire 50% general partnership interest in EEP to Palomero, which then transferred it to Jacquin, so that as of the date of this Agreement, Jacquin and Vinson Trust are the sole general partners of EEP, each with a 50% general

21

partnership interest." The EEP SPA goes on to recite that EEP wished to sell its interest to AGPL and that "[Dale] Dossey, Palomero and PNGDV wish to join in the conveyance of the EEP Interest to Buyer [AGPL] under this Agreement to indicate their consent to, and agreement with, the transactions contemplated hereby."

According to the EEP SPA, the $10 million purchase price was to be paid in four installments. The first $1.25 million installment was to be made by February 28, 2015, with additional installments of $1.25 million, $2.5 million and $5 million to be made within ten days of the occurrence of certain conditions, including conditions described in the OSL SPA. According to Section 1.02(b) of the EEP SPA, all such payments were to be "split equally and paid separately to Vinson Trust and Jacquin, as general partners of EEP[.]" However, Section 1.02(c) states, "Jacquin directs Buyer [AGPL] to pay his share of the Purchase Price to [Dale] Dossey for separate consideration received." Lastly, Section 1.04 indicates that prior to the third installment, AGPL has the right to receive and review information from PNGDV, Palomero and Dale

> to determine appropriate adjustments to the Purchase Price to reflect, among other things, offsets for reimbursement of legal fees, borrowings of PNGDV Investor funds by PNGDV and other matters. If Buyer [AGPL] determines as a result of its review that any amounts should be offset from the Final Installment Payment, it will so inform Vinson Trust and [Dale] Dossey in writing and deduct the aggregate amount of such offset from the Third Installment Payment.

Jacquin's signature appears five times on the EEP SPA. First, he signed as "Authorized Signatory" for the "Buyer" AGPL. Secondly, he signed as trustee for Vinson Trust, in its role as one of the general partners of EEP. Next, he signed for himself as the other general partner of EEP. He signed again as trustee for Vinson Trust, not in its role as general partner of EEP, but to express Vinson Trust's consent to the agreement. Lastly, Jacquin signed individually. Mulacek signed as president of PNGDV. Due to Dale's condition, Jim signed as Dale's agent, both individually and as general partner for Palomero, expressing their consent. The EEP SPA indicates it is to be construed under Singapore law and requires any dispute to be resolved by arbitration in Singapore under Singapore International Arbitration Centre's rules.

Jacquin also signed a "Consent to Payment," both individually and as trustee of Vinson Trust, indicating, in pertinent part:

[…]

2.    The first installment of the Purchase Price in the amount of US$ 1.25 million shall be paid entirely to [Dale] Dossey under Section 1.02(c)…

3.    Section 1.02(b) of the Agreement, which provides that the aggregate Purchase Price will be split equally between Vinson Trust and Jacquin, remains in effect. The parties will reconcile the remaining balance of the Purchase Price in future installment payments.

23

According to the petition, Jacquin "assigned to Dale his right to 50% of the EEP Interest Purchase Price for 'separate consideration,' so that Dale would ultimately receive $5 million cash through the EEP Assignment Instrument." The petition goes on to explain,

> The point of the EEP Assignment Instrument and the ultimate payment of half of the EEP Interest Purchase Price to Dale was to compensate Dale for his past service to [Mulacek] and any future legal services [Mulacek] may require as well as a 'parting gift' by [Mulacek] to Dale due to his terminal cancer diagnosis.

Also, according to the petition, the EEP SPA, combined with another transaction in October 2015, gave AGPL "beneficial ownership of 6.00% of PNGDV's 6.75% Phase One IPI… and, more importantly, gave AGPL the right to 89% of PNGDV's future [OSL SPA] proceeds."

On February 10, 2015, Jacquin signed "Wiring Instructions" directing $1.25 million to be wired to Wells Fargo in Minneapolis, "For further credit to Dale Dossey as General Partner of The Palomero LTD[.]" Mulacek and AGPL claim this payment represented Dale's 50% share of the first two installments of $1.25 million each, and "[t]he final two installment payments are not yet due under the terms of the EEP Assignment Instrument." The Dossey Parties acknowledge receipt of this $1.25 million payment but assert it was only for the first installment, leaving three installments still unpaid.

24

Mulacek's and AGPL's petition alleges that in 2016 Mulacek and Civelli became involved in a dispute over "hundreds of millions of dollars' worth of [Mulacek's and his family's] assets," and that in 2017 Civelli began "pressuring Jim to divulge confidential, attorney-client financial records" belonging to Mulacek and several of his entities. The petition alleges Jim initially resisted but eventually "caved," notified Mulacek that he was terminating their attorney-client relationship, and then divulged highly confidential information which Civelli used "to fabricate baseless claims against [Mulacek] in separate suits in Singapore and the Southern District of Texas in which [Mulacek] has incurred more than $5 million in legal fees to date." The petition also alleges Jim "effectively hijacked PNGDV by purporting to act as PNGDV's 'sole shareholder', on the basis that he was the executor of Dale's estate in Texas," took steps which removed Mulacek and Jacquin as PNGDV's officers and directors, and "then tried to place PNGDV's assets out of [Mulacek's] reach by purporting to transfer most of them to (Civelli-controlled) [entities]." The petition alleges the Dossey Parties breached their fiduciary duties and committed fraud, for which Mulacek and AGPL ask the court to disgorge all previous payments under the EEP SPA and order that no future payments are owed to Dale's estate under the EEP SPA. The petition also seeks damages in the form of attorney fees arising out of the litigation with Civelli, as well as the attorney fees the Dossey Parties charged Mulacek. In addition, AGPL seeks a constructive trust over any

25

PNGDV assets held by the Dossey Parties. Lastly, Mulacek and AGPL ask the court to order an accounting of all payments for legal services from 2005 to the present.

The Dossey Parties assert Mulacek and Jacquin knew Dale was incapacitated with terminal brain cancer and defrauded him out of his 0.5% interest, which they claim was worth at least $19 million. They also claim Jacquin and AGPL tortiously interfered with an existing Texas contract between Dale and Mulacek to pay Dale a 0.5% beneficial interest in PNGDV in exchange for his years of service to Mulacek. Additionally, they ask the court to impose a constructive trust over any past payments Mulacek or Jacquin received under the OSL SPA, as well as any payments they may receive in the future.

**Analysis**

While the Dossey Parties' claims are based primarily on the November 2014 transactions, the trial court could reasonably have viewed those transactions in the context of emails exchanged several months earlier regarding the February 27, 2014 OSL SPA wherein PNGDV's interest was transferred to OSL for $900 million. On March 5, 2014, Jacquin's lawyer, Mattheiu Bringer, emailed Dale (a Texas lawyer conducting business as president of PNGDV, a company whose primary business office was in The Woodlands) reprimanding him for purportedly transferring PNGDV's shares to OSL without the involvement of Jacquin, his family, or the Vinson Trust, who collectively were the majority owners of PNGDV. Bringer

26

requested Dale to provide his clients (one of whom was Jacquin) a detailed written report regarding the status of the proposed transaction and instructed Dale regarding what he should and should not do in the event the transaction had or had not been finalized. Bringer notified Dale that his clients (one of whom was Jacquin) were having documents prepared whereby Dale would be removed from his positions as president and director of PNGDV "so that these matters may be directly dealt with by them as soon as possible." Lastly, Bringer warned Dale that the family would not hesitate to sue Dale in "any court of competent jurisdiction" to protect the family's interest in PNGDV. On March 8, 2014, Mulacek emailed Dale, with a copy to Jacquin, indicating Dale's 0.5% "fee" would be honored "so long as the family is protected and you honor your fiduciary and legal responsibility to the family interest."

Eight months later, not only was Dale removed as PNGDV's president and director of PNGDV, but Jacquin, acting in his individual capacity, became the conduit through which Dale's 0.5% net beneficial interest in Phase One of InterOil's exploration program in Papua New Guinea, allegedly worth $19 million, was transferred to AGPL for $5 million. The first step in the process was the November 7, 2014, Written Consent executed by Palomero (a Texas limited partnership) whereby Jacquin not only acquired Dale's 0.5% interest in EEP, but also became a general partner in EEP, an oral Texas general partnership. On the same date,

27

according to the petition, Jacquin became a director and vice president of PNGDV, a company whose primary business office was in The Woodlands.

The next step in the process was the November 10, 2014 EEP SPA in which EEP's 1% net beneficial interest (50% of which was individually owned by Jacquin) was transferred to AGPL, one of the plaintiffs who filed suit in Texas seeking to disgorge the Dossey Parties from all past and future proceeds of this transaction. Jacquin was on both sides of EEP SPA, signing in his representative capacity for the "Buyer," AGPL, and individually and in representative capacities for the "Sellers" and some of the consenting parties. Jacquin argues on appeal,

> There was no written contract entered into between Dale Dossey, Palomero, or Jacquin. There was simply prior transfers from Dossey to Palomero, from Palomero to Jacquin, and a direction made in the November 2014 Agreement by Jacquin to AGPL to pay his share of the purchase price of the EEP Interest to Dale Dossey "for separate consideration received." The "separate consideration received" is not defined in the November 2014 Agreement. [Record citations omitted].

However, the trial court was entitled to draw reasonable inferences from the evidence, and where the contracts are "all part of one overarching transaction" jurisdiction cannot be escaped "by splitting an integrated transaction into little bits." *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 72-73 (Tex. 2016).

The trial court may have reasonably concluded Jacquin purposefully availed himself of the privilege of conducting activities in Texas by targeting an asset held

28

by a Texas seller. *See Cornerstone*, 493 S.W.3d at 73. Unlike the nonresident defendant in *Searcy v. Parex Res., Inc.,* 496 S.W.3d 58, 73 (Tex. 2016), who "did not specifically seek out a Texas seller or Texas assets, let alone attempt[] to meddle with a contract governed by Texas law or develop a Texas business[,]" Jacquin not only targeted an asset held by a Texas limited partnership on behalf of a Texas citizen but also simultaneously became a general partner in a Texas general partnership and a director and vice president of a company whose primary business office is in Texas. Moreover, it is alleged that he conspired with one Texas citizen to defraud another Texas citizen and that he tortiously interfered with an existing contract between those two Texas citizens arising out of work performed by one of them in Texas. Regardless of whether Jacquin made any misrepresentations or tortiously interfered, his personal involvement in these transactions, rather than the unilateral activity of someone else, indicates he purposefully availed himself of the privilege of conducting activities in Texas. While Jacquin's activities in representative capacities may not be sufficient to subject him to jurisdiction in Texas, we conclude that his actions in his individual capacity are.

Although Jacquin's contacts with Texas may have been few in number, our focus is not on the quantity, but on the quality and nature of those contacts. *Am. Type*, 83 S.W.3d at 806. The trial court may have reasonably concluded Jacquin's contacts with Texas were not random, fortuitous or attenuated, but deliberate,

29

strategic and focused. Eight months after Jacquin's lawyer sent an email threatening to remove Dale from his position with PNGDV, Jacquin was involved in transactions which accomplished that result. While there may have been other factors – such as Dale's condition – which led to these transactions, there was nothing random or fortuitous about the transactions.

Nothing in the record indicates Jacquin was unaware that when he acquired Palomero's interest in EEP he became a general partner in a Texas partnership. To the contrary, the record shows that three days later, Jacquin exercised his new authority as EEP's general partner by signing the EEP SPA which is at the heart of the controversy between the parties in this litigation. By virtue of Jacquin's status as general partner, "his activities are shielded by 'the benefits and protections' of the forum's laws [and] it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). The record supports an implied finding that Jacquin purposefully availed himself of the benefits of doing business in Texas when he decided to participate in the November 2014 transactions.

Even the execution of a single contract may be sufficient to establish purposeful availment when the contract results in a continuous obligation or relationship within the forum state. *See Michiana*, 168 S.W.3d at 787; *see also Moncrief Oil*, 414 S.W.3d at 153 (citing *Burger King*, 471 U.S. at 478) (internal

30

citation omitted) ("While we have held that a single business transaction occurring outside the state is insufficient to confer specific jurisdiction, the United States Supreme Court concluded that forming an enterprise in one state to send payments to a corporation in the forum state was sufficient to confer specific jurisdiction[.]"). Neither Jacquin's unsworn declaration nor anything else in the record indicates that EEP ever ceased to exist as an oral Texas general partnership nor that Jacquin ever withdrew as general partner. The trial court may have reasonably concluded the November 2014 transactions created continuing obligations and relationships between Jacquin and Dale. Section 1.02(b) of the EEP SPA requires AGPL to make future installments to EEP's partners, the Vinson Trust and Jacquin, and in section 1.02(c), Jacquin directs AGPL to send his payments to Dale. Section 1.04 authorizes AGPL to offset the third installment based on information it is entitled to receive from Dale regarding legal fees and other matters, and paragraph 3 of the Consent to Payment indicates, "The parties will reconcile the remaining balance of the Purchase Price in future installment payments." The trial court may have concluded Jacquin was one of "the parties" who would be involved in reconciling future payments since he signed both the EEP SPA and the Consent to Payment in his individual capacity.

The record also supports the trial court's implied finding that Jacquin sought some benefit, advantage or profit by availing himself of privilege of doing business in this jurisdiction. On the surface, Jacquin paid nothing when he acquired an asset

arguably worth $19 million from a Texas citizen and then received nothing when he transferred that same asset three days later for $5 million. However, according to the petition, Jacquin was contemporaneously granted a management role in PNGDV, ownership of which was transferred "to companies controlled by [Jacquin.]" The trial court may have reasonably inferred Jacquin intended to obtain some benefit from voluntarily participating these transactions, if only to gain favor with Mulacek, a Texas citizen, or a position with PNGDV, a company whose principal business office is in The Woodlands.

Jacquin also cannot avoid jurisdiction simply because he did not physically enter the state of Texas to execute the contracts in question. *See Burger King*, 471 U.S. at 476 (absence of physical presence in the forum state does not defeat jurisdiction so long as the defendant's commercial efforts are purposefully directed toward a resident of forum state). And although some of the contracts contain provisions selecting forums outside Texas, "[g]enerally, a forum-selection clause operates as consent to jurisdiction in one forum, not proof that the Constitution would allow no other." *Michiana*, 168 S.W.3d at 792. While the forum-selection clauses cannot be ignored, they do not conclusively negate purposeful availment in light of the other evidence. We conclude the evidence is legally and factually sufficient to support the trial court's implied finding that Jacquin purposefully availed himself of the privilege of conducting activities in Texas.

32

We also conclude the evidence is legally and factually sufficient to support the trial court's implied finding that there is a substantial connection between Jacquin's contacts in Texas and the operative facts of the litigation. Mulacek, AGPL and the Dossey Parties all base their claims on the November 2014 transactions in which Jacquin participated individually, on behalf of the buyer, AGPL, and on behalf of the sellers, EEP, and Vinson Trust. The Dossey Parties claim Mulacek and Jacquin used these transactions to defraud them out of the actual value of Dale's 50% share of the 1% interest held by EEP, whereas Mulacek and AGPL seek to disgorge the Dossey Parties from past and future proceeds of these transactions on the basis of Jim's alleged breach of confidentiality and fiduciary duties. Because the claims are related to Jacquin's contacts in Texas, they give rise to personal jurisdiction in Texas.

Even when a nonresident has purposefully engaged in activities in Texas, the exercise of personal jurisdiction over the defendant may still be unreasonable if it would offend "traditional notions of fair play and substantial justice." *See Burger King*, 471 U.S. at 477-78; *Milliken*, 311 U.S. at 463. However, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. Jacquin has not done so here. "Only in rare cases, however, will the exercise of

jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal,* 815 S.W.2d at 231. We conclude the trial court's exercise of personal jurisdiction over Jacquin does not offend fair play and substantial justice.

## Conclusion

Having found the evidence legally and factually sufficient to support the trial court's denial of Jacquin's special appearance, we overrule Jacquin's issues on appeal and affirm the trial court's order.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on December 2, 2024
Opinion Delivered April 24, 2025

Before Golemon, C.J., Wright and Chambers, JJ.