# IN THE SUPREME COURT OF TEXAS

No. 14-0538

CORNERSTONE HEALTHCARE GROUP HOLDING, INC., PETITIONER,

v.

NAUTIC MANAGEMENT VI, L.P., RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

~ *consolidated with* ~

No. 14-0539

CORNERSTONE HEALTHCARE GROUP HOLDING, INC., PETITIONER,

v.

NAUTIC PARTNERS VI, L.P., RELIANT SPLITTER, L.P., AND
KENNEDY PLAZA PARTNERS VI, L.P., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**Argued January 12, 2016**

JUSTICE LEHRMANN delivered the opinion of the Court.

In these causes we consider whether Texas courts have specific personal jurisdiction over three nonresident private-equity fund limited partnerships and their general partner. The funds invested in a newly created Texas subsidiary that purchased a chain of Texas hospitals from a Texas company. The plaintiff, another Texas company allegedly in the market to purchase the hospitals, asserts that this conduct was tortious and subjects the defendants to Texas's jurisdiction with respect to claims arising out of that conduct. We agree and hold that Texas courts have specific jurisdiction over the private-equity funds and their general partner.

## I. Background

Plaintiff Cornerstone Healthcare Group Holding, Inc. owns and operates long-term acute-care hospitals in Texas and other states. According to its pleadings, Cornerstone "sought to expand into other sectors of the post-acute care continuum." Several Cornerstone executives (Executives) identified Reliant Hospital Partners, LLC (Old Reliant), which owned a chain of inpatient rehabilitation facilities in Texas, as a possible takeover target. Cornerstone alleges that the Executives "decided to take advantage of this opportunity for themselves" rather than present it to Cornerstone's board and that they approached several potential investment sources about the deal, including Rhode Island-based private-equity firm Nautic Partners, LLC.

Nautic Partners is a management advisor that identifies and conducts due diligence on potential investments for several private-equity funds. The three funds at issue here—Nautic Partners VI, L.P., Reliant Splitter, L.P., and Kennedy Plaza Partners VI, L.P. (collectively, the Funds)—are Delaware limited partnerships with their principal places of business in Rhode Island. Nautic Management VI, L.P., also a Delaware limited partnership, is the general partner of two of

2

the Funds and manager of the third. We will refer to Nautic Management VI as the General Partner.[1]

Based on its due diligence, Nautic Partners determines whether to present an investment opportunity to the General Partner's investment committee, which authorizes investment decisions for the Funds.[2] Scott Hilinski is Nautic Partners' managing director and, along with two other Nautic Partners employees, is also a member of the General Partner's investment committee. According to the General Partner's corporate representative, Hilinski has a fiduciary duty to bring to the committee any deal that would be an "appropriate" investment for the Funds.

In November 2010, Cornerstone's then-Chief Executive Officer Michael Brohm contacted Nautic Partners to discuss a potential health-care investment opportunity. Shortly thereafter, Brohm specifically proposed that the Funds acquire Old Reliant's assets and hire Brohm and other Cornerstone executives to run the company. Hilinski met with Brohm and another Cornerstone executive at a "get-to-know-you dinner" in Texas. Hilinski subsequently called Old Reliant's owner in Texas expressing interest in the investment. On November 22, Nautic Partners and Old Reliant signed a confidentiality agreement "in connection with [Nautic Partners'] evaluation of a potential transaction with [Old Reliant]," and Nautic Partners began investigating the acquisition.

Nautic Partners' due diligence included site visits to Old Reliant's hospitals in Texas by Hilinski and Chris Corey, another Nautic Partners employee. Cornerstone alleges that Brohm disclosed Cornerstone's confidential information to Nautic Partners during the due-diligence

---

[1] The General Partner's corporate representative testified that, despite its designation as manager of one of the Funds, the General Partner has the same authority to act on behalf of all three.

[2] Neither the Funds nor the General Partner has employees, office space, office equipment, or "similar tangible resources."

period and that Nautic Partners used that information to evaluate the Reliant deal. On January 7, 2011, Nautic Partners and Old Reliant signed a letter of intent summarizing the "terms and conditions under which an entity . . . to be formed by funds affiliated with Nautic Partners" would purchase Old Reliant's assets. The letter further stated that "Nautic's deal team has discussed the proposed transaction with the members of Nautic's Investment Committee, and this Letter is submitted with the endorsement and excitement of that group."

Hilinski presented the deal to the General Partner's investment committee over three meetings in Rhode Island in January and February 2011. On March 14, 2011, the committee authorized the investment and issued a capital call to fund the deal. A chain of wholly owned subsidiaries was established to facilitate the transaction, which closed March 23. On that date, the Funds entered into a limited liability company agreement with Reliant Holding Company,[3] a new Delaware LLC with its principal place of business in Texas, which the Funds describe as a "passive investment vehicle." In turn, Reliant Holding owned 100% of Reliant Pledgor, also a Delaware LLC, which owned 100% of Reliant Opco Holding Corp., a Delaware corporation. Finally, Reliant Pledgor and Reliant Opco owned, respectively, 99.9% and 0.1%[4] of Reliant Acquisitions, LLC, which would eventually change its name to Reliant Hospital Partners, LLC (New Reliant).[5] New Reliant, a Delaware LLC with its principal place of business in Texas, entered into an asset-purchase agreement with Old Reliant to acquire and operate its hospitals.

---

[3] Hilinski signed the LLC agreement on behalf of Reliant Holding as its manager, and on behalf of all three Funds as the General Partner's managing director.

[4] The record is inconsistent as to whether the respective ownership percentages were 99.9% and 0.1% or 99.99% and 0.01%.

[5] The middle subsidiary layer, Reliant Pledgor, was created for tax purposes.

The money New Reliant used to purchase the hospitals came from the Funds' capital contributions to Reliant Holding. The purchase price was "deemed" to pass from the Funds to Reliant Holding, from Reliant Holding to Reliant Pledgor, from Reliant Pledgor to New Reliant, and finally from New Reliant to Old Reliant. In actuality, the Funds transferred the money to the law firm that served as New Reliant's disbursement agent, and the law firm transferred the purchase price directly to Old Reliant. New Reliant's transaction expenses on the deal included a $1 million "transaction fee" to the General Partner and $85,000 to Nautic Partners to reimbursement its expenses.

Immediately following the acquisition, Brohm and the other Executives resigned from Cornerstone and joined New Reliant. Two weeks later, Cornerstone sued the Executives,[6] New Reliant, and Nautic Partners. Cornerstone later added as defendants, among others, Old Reliant, the Funds, the General Partner, Hilinski, Corey, and one other Nautic Partners employee. Cornerstone accuses the Executives of utilizing its proprietary and confidential information to usurp a corporate opportunity for their own and New Reliant's benefit, misappropriating Cornerstone's confidential information following their resignations, and breaching their fiduciary duties. Cornerstone alleges the Nautic entities and employees conspired with and assisted the executives in their tortious conduct. Cornerstone also asserts tortious interference claims against these defendants.

The Funds and the General Partner, to which we will refer collectively as the respondents, filed special appearances contesting the trial court's personal jurisdiction over them. Nautic

---

[6] Specifically, Cornerstone named as defendants former Cornerstone executives Brohm, Patrick Ryan, Kenneth McGee, Jerry Huggler, and Chad Deardorff.

5

Partners, New Reliant, Hilinski, and the other Nautic Partners employees entered general appearances and did not contest jurisdiction. The trial court granted the Funds' special appearance but denied the General Partner's. Cornerstone appealed the former order, and the General Partner appealed the latter. In separate opinions issued by different panels, the court of appeals affirmed as to the Funds and reversed as to the General Partner, holding that Texas lacks jurisdiction over all four entities. ___ S.W.3d ___ (Tex. App.—Dallas 2014); ___ S.W.3d ___ (Tex. App.—Dallas 2014). We granted Cornerstone's petitions for review and consolidated the cases for oral argument.[7]

## II. Personal Jurisdiction Framework

In several recent cases, we have reaffirmed the well-established framework for analyzing personal jurisdiction, both generally and more specifically in the business-tort context. Courts have personal jurisdiction over a nonresident defendant when the state's long-arm statute authorizes such jurisdiction and its exercise comports with due process. *TV Azteca v. Ruiz*, ___ S.W.3d ___, ___ (Tex. 2016). We have held that "the requirements of the Texas long-arm statute are satisfied if an assertion of jurisdiction accords with federal due-process limitations," and those limitations therefore guide our analysis. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007). A state's exercise of jurisdiction comports with federal due process if the

---

[7] We have jurisdiction over interlocutory appeals in which the court of appeals "holds differently from a prior decision of" this Court, meaning that "there is inconsistency in the[] respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." TEX. GOV'T CODE § 22.225(c), (e). Cornerstone argues that the court of appeals' decisions conflict with this Court's opinion in *Spir Star AG v. Kimich*, in which we held that a nonresident manufacturer that "intentionally targets Texas as the marketplace for its products" may not escape Texas's jurisdiction with respect to product-liability claims "merely by forming a Texas affiliate" to make the sales. 310 S.W.3d 868, 871, 875 (Tex. 2010). The court of appeals found *Spir Star*'s reasoning inapposite outside the stream-of-commerce context applicable to product claims, revealing uncertainty to be clarified in this area.

nonresident defendant has "minimum contacts" with the state and the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).[8]

The "touchstone" of a minimum-contacts analysis is purposeful availment. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). To that end, a "defendant establishes minimum contacts with a forum when it 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013) (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). Three primary considerations underlie the purposeful-availment analysis: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be "purposeful" and not "random, isolated, or fortuitous"; and (3) the defendant "must seek some benefit, advantage, or profit by availing itself of the jurisdiction" such that it impliedly consents to suit there. *Michiana*, 168 S.W.3d at 785 (citations and internal quotation marks omitted). Although "physical presence in the forum" is "a relevant contact," it "is not a prerequisite to jurisdiction." *Walden*, 134 S.Ct. at 1122.

A defendant's contacts with the forum may give rise to either general or specific jurisdiction. General jurisdiction is established by a defendant's "continuous and systematic" contacts that render it "essentially at home in the forum State," irrespective of whether the

---

[8] The ultimate question of whether Texas courts have personal jurisdiction over a nonresident defendant is one of law that we review de novo. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence." *Id.*

7

defendant's alleged liability arises from those contacts. *TV Azteca*, ___ S.W.3d at ___ (quoting *Daimler AG v. Bauman*, 134 S.Ct. 746, 754 (2014)) (internal quotation marks omitted); *Moki Mac*, 221 S.W.3d at 575. Specific jurisdiction arises when the plaintiff's cause of action "arises from or relates to the defendant's contacts." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010). Our inquiry in this case is confined to specific jurisdiction, which requires us to "focus on the relationship among the defendant, the forum[,] and the litigation." *Moki Mac*, 221 S.W.3d at 575–76 (citations and internal quotation marks omitted).

### III. Analysis

### A. Minimum Contacts

Cornerstone argues that the Funds, via the General Partner,[9] established minimum contacts with Texas by purchasing Texas hospitals through wholly owned subsidiary New Reliant. No disagreement should exist, Cornerstone contends, that these contacts were purposeful as opposed to random or fortuitous, and that the respondents sought a benefit or profit from the Texas investment. Cornerstone couches the dispute as whether the Texas contacts "count against" the Funds and the General Partner even though New Reliant actually purchased the hospitals. According to Cornerstone, they do. "[N]obody else made the decision to acquire these Texas hospitals," Cornerstone asserts, "because nobody else had the money."

By contrast, the respondents describe their role in the underlying events as "limited to creating and funding a subsidiary that, in turn, indirectly invested in the Reliant hospital chain

---

[9] It is undisputed that the General Partner acted on the Funds' behalf in all matters related to the Reliant transaction. *See* Lee Harris, *A Critical Theory of Private Equity*, 35 DEL. J. CORP. L. 259, 269 (2010) (noting that in a limited partnership "the general partner raises the fund, manages and operates the fund, owes duties to the fund, and acts as an agent of the fund vis-a-vis third parties"). For example, as noted, the General Partner approved the investment and signed the LLC agreement on each of the Funds' behalf.

through further subsidiaries." They cite settled law that the contacts of distinct legal entities, including parents and subsidiaries, must be assessed separately for jurisdictional purposes unless the corporate veil is pierced. *E.g.*, *PHC-Minden, LP v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 172–73 (Tex. 2007). They argue in turn that, because "the record shows that it was the Funds' indirect subsidiary, New Reliant, *not* the Funds themselves that had direct contacts with Texas," and because Cornerstone has never argued or proved that New Reliant's contacts may be attributed to the respondents under a veil-piercing theory, jurisdiction over the respondents is lacking. The court of appeals agreed, holding that the Funds "took no direct action in Texas" and merely "invested in New Reliant through subsidiaries." ___ S.W.3d at ___. Similarly, the court held that "Cornerstone did not present evidence of [the General Partner's] contacts with Texas related to the Reliant hospital acquisition and did not rebut [the General Partner's] evidence that it did not have [such] contacts." ___ S.W.3d at ___ (emphasis omitted).

The respondents are correct that "so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other." *PHC–Minden*, 235 S.W.3d at 172 (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983)); *see also Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335 (1925). They are also correct that Cornerstone has not argued that the Funds and their subsidiaries failed to maintain their legal separateness or that the Texas contacts of any one of those entities could or should be attributed to any other. Accordingly, New Reliant's Texas contacts—specifically, its ownership and operation of hospitals in Texas—could not in and of themselves subject New Reliant's limited-partner parent companies and their general partner to Texas's jurisdiction. But

9

we disagree with the respondents that the Funds' use of a subsidiary to purchase the hospitals effectively ends the inquiry.

The respondents frame the acquisition of Old Reliant's assets as a succession of events: the General Partner's investment committee met in Rhode Island for presentations by Nautic Partners and the prospective Reliant management team (i.e., the Cornerstone executives) about the investment; the General Partner authorized the Funds to invest in Reliant Holding and issued a capital call (actions that also took place in Rhode Island); the Funds created Reliant Holding pursuant to that authorization; Reliant Holding formed Reliant Pledgor and Reliant Opco; Reliant Pledgor and Reliant Opco formed New Reliant; and New Reliant acquired the hospitals. But in reality, these events were all part of one overarching transaction that closed March 23, 2011.

The LLC agreement between Reliant Holding and its members (the Funds), which had a March 23 effective date, provided that the members' capital contributions to Reliant Holding would be used as "a contribution to capital to one or more Subsidiaries to effect the consummation of the transactions contemplated by the Asset Purchase Agreement and payment of certain transaction expenses related thereto on the Effective Date." The referenced Asset Purchase Agreement was the agreement between New Reliant and Old Reliant for the hospitals' purchase. Thus, the money the Funds invested in Reliant Holding—which, incidentally, listed its principal place of business as Addison, Texas—was contractually required to be used for New Reliant's purchase of the Reliant hospitals. And as noted above, the purchase money was transferred by the

10

Funds directly to the law firm serving as New Reliant's disbursement agent, and from the agent to Old Reliant.[10]

Further, all of the Funds' relevant subsidiaries, from Reliant Holding to New Reliant, were newly created to complete the transaction that the respondents set in motion. Cornerstone is not attempting to attribute the contacts established by New Reliant as a going concern to the Funds or the General Partner. Rather, it is seeking to trace the purchase of Texas assets to the entities that spearheaded and directed the transaction, and ultimately stood to profit from it. We agree with Cornerstone that "[k]eeping legal entities distinct does not mean they can escape jurisdiction by splitting an integrated transaction into little bits." Although "only the defendant's contacts with the forum" count, not "the unilateral activity of another party or a third person," the Reliant deal did not stem from a third party's unilateral activity; it was the result of a transaction stemming from the activity of the respondents themselves. *Michiana*, 168 S.W.3d at 785.

The General Partner argues that its state of mind when it acted in Rhode Island to direct the investment is irrelevant to whether it had contacts with Texas. *See id.* at 791 ("Business contacts are generally a matter of physical fact, while tort liability . . . turns on what the parties thought, said, or intended."). But whether the respondents' conduct was ultimately tortious is not before us and is not relevant to the minimum-contacts analysis. *Id.* at 790 (holding that purposeful availment does not depend on "whether a tort was directed toward Texas" because, if it did, "a nonresident may defeat jurisdiction by proving there was no tort"). Further, this is not a case in

---

[10] The respondents maintain that the disbursement agent "credited and debited the money to each subsidiary" and that "corporate formalities were observed." That may be the case, but the document on which the respondents rely expressly distinguishes between the "deemed" transaction sequence involving the chain of subsidiaries and the "actual transfers" documented above.

which jurisdiction turns on the mere foreseeability of causing injury in Texas. *Id.* at 787. Instead, the Funds, through the General Partner, targeted Texas assets in which to invest and sought to profit from that investment.[11]

By contrast, we hold today in *Searcy v. Parex Resources, Inc.* that Texas lacks jurisdiction over a Canadian company that was sued for tortious interference with the plaintiff's agreement to purchase shares of a Bermuda corporation's subsidiary, which owned Colombian oil-and-gas operations. ___ S.W.3d ___, ___ (Tex. 2016). Although the seller of the shares had operations in Texas and communicated with the Canadian company in Texas, we concluded that the seller's Texas presence was "coincidental" as far as the Canadian company was concerned because it "was not specifically seeking out a Texas seller or Texas assets." *Id.* at ___. Conversely, the respondents here specifically sought both a Texas seller and Texas assets. Accordingly, we hold that the respondents' contacts with Texas were "purposeful" and that the respondents sought "some benefit, advantage, or profit by availing [themselves] of the jurisdiction" such that they impliedly consented to suit here.[12] *Michiana*, 168 S.W.3d at 785.

Because Cornerstone alleges the respondents' minimum contacts give Texas specific, rather than general, jurisdiction over the respondents, we must determine whether Cornerstone's

---

[11] The Funds' corporate representative testified about the "lifespan" of a private-equity fund, explaining: "Usually the lifespan is, you have five to six years to make your investments, and then the partnership itself has a 10-year life cycle, with possible extensions." He noted that, at the time of his deposition, one of the Funds was "towards the end of its investment cycle" and therefore "somewhere between the earliest one-third or mid-life of its life cycle." The Funds thus appear to have been established in a manner consistent with the typical private-equity fund arrangement. *See* Harris, 35 DEL. J. CORP. L. at 279 (noting that "parties to a private equity limited partnership frequently agree that the limited partnership shall terminate after some finite period, usually ten years").

[12] The parties dispute whether the trial court's denial of the General Partner's plea to the jurisdiction is supported by evidence that Hilinski acted on behalf of the General Partner, rather than (or in addition to) Nautic Partners, when he conducted due diligence on the Reliant deal in Texas. Our analysis above renders it unnecessary to address this dispute.

causes of action arise from or relate to the respondents' purposeful contacts with Texas. *Spir Star*, 310 S.W.3d at 873. We have held that this standard requires "a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. Cornerstone alleges that the respondents used Cornerstone's confidential information to divert the Reliant deal and that the transaction itself, which culminated in the Funds' subsidiary's purchase of Old Reliant's assets, constituted tortious interference as well as aiding and abetting the Executives' usurpation of the Reliant opportunity. Because the facts surrounding the Reliant transaction—which is the crux of the respondents' purposeful contact with Texas—will be the focus of the claims against the respondents at trial,[13] we hold that those claims arise out of the respondents' Texas contacts.

## B. Fair Play and Substantial Justice

Having determined that the respondents have minimum contacts with Texas, we turn to whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice, as due process requires. *Walden*, 134 S.Ct. at 1121. Relevant factors in this analysis include, where appropriate:

> (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies.

---

[13] We noted in *Moncrief* that "a court need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contacts." 414 S.W.3d at 150–51.

*Moncrief*, 414 S.W.3d at 155 (citing *Spir Star*, 310 S.W.3d at 878). As we have recognized, if "a nonresident has minimum contacts with the forum, rarely will the exercise of jurisdiction over the nonresident *not* comport with [such] notions." *Id.* at 154–55 (emphasis added).

This is not one of those rare occasions. Nautic Partners, Hilinski, and others associated with the Nautic entities are already litigating in Texas and have not challenged jurisdiction. Any added burden on the respondents is relatively minimal and does not outweigh Texas's interest in adjudicating a dispute involving the alleged usurpation of a corporate opportunity in Texas involving Texas assets. Further, litigating the claims against the respondents together with the claims against the other Nautic entities and individuals promotes judicial economy. *See id.* at 155. Accordingly, we hold that exercising personal jurisdiction over the respondents comports with traditional notions of fair play and substantial justice.

### IV. Conclusion

The trial court has personal jurisdiction over the Funds and the General Partner. We reverse the court of appeals' judgments and remand to the trial court for further proceedings.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 17, 2016

14