# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00542-CV

**Todd C. Davis, Appellant**

**v.**

**Next Frontier Holdings, Inc. and Benuvia, Inc., Appellees**

### FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 23-1914-C368, THE HONORABLE SARAH SOELDNER BRUCHMILLER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This interlocutory appeal arises from the trial court's denial of Todd C. Davis's special appearance.[1] Next Frontier Holdings, Inc. and Benuvia, Inc. (collectively, Plaintiffs) sued Davis and others for business torts following a dispute concerning the sale of a Round Rock-based pharmaceutical manufacturing facility and its assets. Davis filed a special appearance, which, after limited discovery and a hearing, the trial court denied. For the following reasons, we affirm the trial court's order.

---

[1] This opinion issues alongside a related appeal by co-defendant Murchinson Ltd. *See Murchinson Ltd. v. Next Frontier Holdings, Inc.*, 03-24-00543-CV, (Tex. App.—Austin April 29, 2025, no pet. h.) (mem. op.). The two appeals arise from the same underlying case and share the same factual and procedural background.

## BACKGROUND

The underlying case concerns a dispute related to the acquisition of—and, following the buyer's default, subsequent resale of—a pharmaceutical manufacturing facility. Plaintiffs are companies that develop, manufacture, and synthesize FDA-approved compounds for pharmaceutical products. Next Frontier formed Benuvia, Inc. specifically to acquire two asset-holding entities, Benuvia Manufacturing, Inc. and Benuvia Therapeutics, LLC, from Benuvia Holdings, LLC[2] (a Delaware corporation with its principal place of business in Florida) for $44.9 million. The Benuvia assets include the Round Rock-based pharmaceutical manufacturing facility, which has approximately 70 employees, and its assets, plus intellectual property and FDA permits. The seller-financed acquisition closed in December 2021. Plaintiffs paid with $18 million in cash and a $26.9 million secured note, for which the acquired assets served as collateral. Todd C. Davis (a Florida- and Massachusetts-based manager of Benuvia Holdings) signed the purchase agreement on behalf of the seller, Benuvia Holdings, and Shannon Soqui (Next Frontier's executive chairman) signed on the buyer's behalf.

As part of the acquisition, Murchinson (a Toronto-based investment advisory fund) acted as "a subadvisor to certain indirect shareholders" of Benuvia Holdings. Cannvalate Pty., Ltd. (an Australian corporation with its principal place of business in Victoria, Australia) agreed to invest $5 million into Benuvia for a ten-percent ownership interest. However, due to a fluctuation in the exchange rate during the wire transfer, only $4,858,955.45 transferred to Benuvia Holdings such that there was a $141,044.55 shortfall, which Cannvalate continued to owe to Benuvia. The

---

[2] We refer to plaintiff Benuvia, Inc. as "Benuvia" and defendant Benuvia Holdings, LLC as "Benuvia Holdings."

same day the acquisition closed, Benuvia signed a definitive agreement to merge with Jupiter Wellness, Inc., a Nasdaq-listed company, in a transaction worth approximately $250 million.

During the acquisition, Sudhanshu "Sud" Agarwal served as a consultant for Next Frontier, advising on technical, business, and FDA due-diligence matters. After the sale, Agarwal was appointed to Benuvia's board of directors and agreed to serve as its CEO, for which he accepted a compensation package including 10% equity in Benuvia. Agarwal is a Malaysian and Australian citizen, but he moved to Austin after accepting employment with Benuvia. During the acquisition and his time as Benuvia's CEO, Agarwal was also an owner of Cannvalate. After Agarwal joined Benuvia as CEO, Marilynn Martin, then Next Frontier's Business Development and Integration Officer, was promoted to his Chief of Staff.

Agarwal and Plaintiffs' relationship quickly deteriorated. Plaintiffs allege that soon after Agarwal assumed his new role, he "demand[ed]" that his stock ownership in Benuvia be increased from 10% to 50% and "threatened that, otherwise, he would 'drive Benuvia into a default' on the Secured Note"—which Plaintiffs maintain was "owed to Defendant Murchinson and Davis"—and "disrupt Benuvia's pending $250,000,000 merger with Jupiter Wellness, Inc." Plaintiffs represent that they twice came to preliminary agreements with Agarwal, in which he agreed to receive a stock-option grant representing additional equity in Benuvia, but Agarwal "changed his mind and demanded more stock options, and reiterated his threat that, otherwise, he would drive Benuvia into a default on the Secured Note and bankruptcy and disrupt Benuvia's merger with Jupiter Wellness." Plaintiffs characterize the negotiations as "volatile" and resulting in a "soured" relationship between Benuvia and Agarwal.

Meanwhile, Plaintiffs contend that beginning in January 2022, Agarwal and Martin collaborated with Davis, Muna Said (Benuvia Holdings' director), and Shiraz Noor (a Benuvia

3

Holdings employee) "to acquire Benuvia back from Next Frontier Holdings and to complete several related-party banking transactions with Agarwal that were not approved by the Benuvia Board and were against expressed instructions from [Plaintiffs] not to complete such transactions." Specifically, Plaintiffs assert that Benuvia informed Benuvia Holdings (through Davis) that all discussions regarding the secured note, potential refinancing or restructuring of the note, and all financial matters related to Benuvia should be conducted solely by Soqui on Benuvia's behalf. Benuvia insisted that Agarwal—then still Benuvia's CEO—should not be contacted to discuss any financing or capitalization matters.

Despite those instructions, however, Plaintiffs contend that Agarwal and Davis "began meeting in secret . . . to discuss the potential acquisition of [the Benuvia assets] by Agarwal from Benuvia Holdings after a default by Benuvia on the Secured Note." To that end, Plaintiffs allege that under Agarwal's direction, Benuvia missed the first installment payment on the secured note, after which Plaintiffs, Murchinson, and Benuvia Holdings agreed to defer and restructure the payments. Plaintiffs maintain that "[t]his negative event, combined with unauthorized and disparaging communications by Defendants" led the Jupiter Wellness merger "to fall apart," and on February 17, 2022, that merger officially terminated.

In their pleadings, Plaintiffs contend that Agarwal and Martin authorized, and Benuvia Holdings processed, approximately $415,000 of "unlawful payments" in Benuvia funds, including paying Cannvalate's $141,044.55 debt to Benuvia Holdings and amounts Agarwal personally owed to Benuvia Holdings. Plaintiffs maintain that the "final plan was two-fold: (1) sabotage the Jupiter Wellness merger, and (2) force Plaintiffs to default on the Note so that Benuvia Holdings could reacquire [the secured assets, including] the Round Rock facilities at a UCC sale." After discovering these actions, Plaintiffs state that they "immediately took action,"

4

including presenting the findings to the Benuvia board of directors, which terminated Agarwal as CEO on March 22, 2022, and suspended him from the board after he refused to resign.[3] Meanwhile, Benuvia signed a definitive agreement to merge with Pono Capital Corporation in a deal worth $440 million.

After Plaintiffs did not cure the defaults on the note, in April 2022, Benuvia Holdings sent Plaintiffs a notice of acceleration and notice of a UCC sale of the secured assets set for June 2022. Shortly after, Plaintiffs and Benuvia Holdings (through Davis) signed a forbearance agreement under which Benuvia Holdings agreed to restructure the remaining payments and withdraw the UCC sale. But on July 22, Benuvia Holdings sent a second notice of acceleration, which Plaintiffs claim forced Benuvia to terminate its planned merger with Pono Capital. Benuvia Holdings followed the notice of acceleration with a UCC sale on August 18, at which Benuvia Holdings reacquired Benuvia's assets from Plaintiffs for $8.1 million. Benuvia Holdings then sued Next Frontier in New York state court for the remaining balance on the note and obtained a judgment against Next Frontier for approximately $26 million.

Plaintiffs filed this lawsuit in September 2023, suing Davis, Agarwal, Benuvia Holdings, Murchinson, Cannvalate, and Martin for fraud, fraudulent inducement, fraud by nondisclosure, negligent misrepresentation, tortious interference with contract, civil conspiracy, and knowing participation in Agarwal's breach of fiduciary duty. All defendants (besides Agarwal, who has not been served) filed special appearances, and the trial court granted Cannvalate's and Martin's. The trial court held a joint hearing on the remaining special appearances by Benuvia

---

[3] Agarwal eventually resigned from the Benuvia board in June 2022.

5

Holdings, Murchinson, and Davis and denied all three. Benuvia Holdings, Murchinson, and Davis all separately appealed, but Benuvia Holdings later voluntarily dismissed its appeal.

## APPLICABLE LAW

A Texas court has personal jurisdiction over a nonresident defendant if authorized by the Texas long-arm statute and the exercise of personal jurisdiction is consistent with federal and state constitutional guarantees of due process. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016). The Texas long-arm statute authorizes the exercise of jurisdiction over a nonresident defendant doing business in Texas. Tex. Civ. Prac. & Rem. Code §§ 17.041–.045. Among other things, a nonresident "does business" in Texas if he "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state" or "commits a tort in whole or in part in this state." *Id.* § 17.042(1)–(2). The long-arm statute's "broad doing-business language allows [it] to reach as far as the federal constitutional requirements of due process will allow." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (internal quotation marks omitted).

The exercise of jurisdiction meets federal due-process standards when (1) the nonresident has minimum contacts with the forum state and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013); *see International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "A defendant establishes minimum contacts with a state when it 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

6

"The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002).

A nonresident defendant's minimum contacts with the forum state can give rise to either general or specific jurisdiction. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).[4] Specific jurisdiction exists only if the alleged liability arises out of or is related to the defendant's contact with the forum. *Moki Mac*, 221 S.W.3d at 576. When specific jurisdiction is alleged—as it is here—the focus of the minimum-contacts analysis is on the relationship among the defendant, the forum, and the litigation. *See id.* at 575–76. Therefore, if the court concludes that a nonresident defendant has minimum contacts with Texas by purposefully availing itself of the privilege of conducting activities here, the court must then address whether the defendant's alleged liability arises out of or is related to those contacts. *Id.* at 579. When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors: (1) "only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person"; (2) "the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated"; and (3) "the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction." *Moncrief Oil*, 414 S.W.3d at 151; *accord Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005).

---

[4] General jurisdiction is not at issue in this appeal. Although Plaintiffs originally contended that the trial court could exert general jurisdiction over Davis, they abandoned this argument at the special-appearance hearing and do not argue general jurisdiction on appeal.

## STANDARD OF REVIEW

"[T]he plaintiff and the defendant bear shifting burdens of proof in a challenge to personal jurisdiction." *Kelly v. General Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). Under the Texas long-arm statute, the plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute. *Id.* If the plaintiff does meet this initial burden, the burden shifts to the nonresident defendant to negate all jurisdictional bases properly pleaded by the plaintiff on either a factual or legal basis. *Id.* at 658–59. Factually, the defendant can present evidence that it has no contacts with Texas, thus disproving the plaintiff's allegations. *Id.* at 659. The burden then shifts back to the plaintiff to present evidence affirming its allegations. *Id.* On a legal basis, "the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.*

Whether a Texas court has personal jurisdiction over a nonresident defendant is a legal question that we review de novo. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021). However, trial courts must often resolve questions of fact before deciding jurisdictional issues. *Kelly*, 301 S.W.3d at 658. When the parties agree on the relevant facts, our review is de novo; however, if there is a factual dispute, appellate courts may be called upon to review the trial court's resolution. *American Type Culture Collection*, 83 S.W.3d at 806. When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence. *Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). We presume the trial court resolved all factual

disputes in favor of its judgment. *BMC Software*, 83 S.W.3d at 795. When the appellate record includes the reporter's and clerk's records, as it does here, the trial court's implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.* Here, Davis states that he "challenges all such presumed findings on all components of the special appearance analysis," which we construe as a challenge to both the legal and factual sufficiency of the trial court's implied findings.

Under a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. We will sustain a legal-sufficiency challenge if the record reveals that the evidence offered to prove a vital fact is no more than a scintilla. *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014).

In a factual-sufficiency review, the appellate court considers and weighs all the evidence in the record, which includes all evidence before the trial court on the issue of personal jurisdiction. *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 871 (Tex. App.—Austin 2008, no pet.). "Evidence is factually insufficient only if, in light of the entire record, a finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust." *Leesboro Corp. v. Hendrickson*, 322 S.W.3d 922, 926 (Tex. App.—Austin 2010, no pet.) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). However, "[t]he trial court is the sole judge of witness credibility and the weight to be given to testimony, and we 'will not disturb a trial court's resolution of conflict evidence that turns on the credibility or weight of the evidence.'" *Id.* at 926–27 (citing *Ennis v. Loiseau*, 164 S.W.3d 698, 706 (Tex. App.—Austin 2005, no pet.)).

9

**DISCUSSION**

In five issues on appeal, Davis contends the trial court erred in denying his special appearance. First, Davis argues that the trial court erred in denying his special appearance because he contends that Plaintiffs did not plead sufficient allegations to bring him within the reach of Texas's long-arm statute. Second, Davis maintains that even if Plaintiffs did plead sufficient jurisdictional allegations, he met his burden to negate all bases of personal jurisdiction alleged by Plaintiffs. Third, Davis contends that Plaintiffs failed to offer evidence that would authorize the exercise of specific jurisdiction. Fourth, Davis argues that the exercise of personal jurisdiction over him in this case does not comport with traditional notions of fair play and substantial justice. Finally, Davis challenges the factual and legal sufficiency of the trial court's implied findings authorizing the exercise of specific jurisdiction.

Texas Rule of Civil Procedure 120a requires a special appearance to be determined based on "the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P. 120a(3). Therefore, we consider not only the allegations in Plaintiffs' petition, but also the parties' affidavits, exhibits, discovery responses, and testimony that support or undermine the allegations. *Enright v. Asclepius Panacea, LLC*, No. 03-15-00348-CV, 2016 WL 1048881, at *5 (Tex. App.—Austin Mar. 8, 2016, no pet.) (mem. op.) (citing *Kelly*, 301 S.W.3d at 658 n.4).

As a threshold matter, we note that we consider Davis's contacts on an aggregate basis because all of Plaintiffs' claims arise from the same alleged forum contacts. When a plaintiff brings multiple claims, specific jurisdiction requires courts "to analyze jurisdictional contacts on a claim-by-claim basis"; however, "a court need not assess contacts on a claim-by-claim basis if

10

all claims arise from the same forum contacts." *Moncrief Oil*, 414 S.W.3d at 150–51. Here, because Plaintiffs' claims—which are different varieties of business torts—all arise from actions surrounding the Benuvia acquisition and those facts will be the focus of the claims at trial, we assess Davis's forum contacts collectively, rather than on a claim-by-claim basis. *See Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 74 & n.13 (Tex. 2016).

First, Davis argues that Plaintiffs did not meet their initial burden to plead sufficient allegations to bring him within the reach of the Texas long-arm statute. *See* Tex. Civ. Prac. & Rem. Code § 17.042. Specifically, Davis maintains that Plaintiffs' references to him in their pleadings are "simply blanket allegations directed broadly and indiscriminately at all defendants," and the "few allegations directed specifically at [] Davis are conclusory and unsupported by evidence in the record."

However, Plaintiffs carried their initial burden to plead that Davis conducted business and committed torts in Texas. *See Kelly*, 301 S.W.3d at 658–59. In Plaintiffs' first amended petition—which includes a section specifically addressing the specific-jurisdiction argument as to all defendants—they state that the trial court has personal jurisdiction over all defendants because they "knowingly and intentionally committed a tort in whole or in part in Texas against a company located in Round Rock, Texas and/or because Defendants contracted by mail or otherwise to perform the contract in whole or in part in Round Rock, Texas."

Plaintiffs also raise multiple allegations specifically against Davis. For example, Plaintiffs allege that "for years" before the Benuvia acquisition, Davis "managed and directed approximately 70 employees who worked out of the Round Rock location" and worked closely with "Texas agencies and other business partners" that were "necessary to keep their pharmaceutical companies running." Plaintiffs allege that Davis, through Benuvia Holdings,

11

"funded the capital needed to operate the Benuvia asset companies" and "approved all material transactions, contracts and events that occurred in the Benuvia Assets in Round Rock, Texas," including "overs[eeing] transactions involving the City and State of Texas," arranging "for the leasing of real property by the Benuvia Asset companies in Round Rock, Texas," and "overs[eeing] the bank accounts used to operate the Benuvia Assets." Plaintiffs also allege that "Davis, through Benuvia Holdings, sold the Benuvia Assets to Next Frontier and lent money to Next Frontier to purchase and operate the Benuvia Assets in Round Rock, Texas," claiming that "Davis was involved in all aspects of the sale and loan transactions, and personally executed many of the key contracts and agreements."

Further, after the acquisition, Plaintiffs allege that Davis "took an active role [in] repossessing the Benuvia Assets" and was "involved in the scheme alleged herein, to ultimately retake Benuvia's assets for his own personal benefit and to personally enrich himself by depriving Plaintiffs of their personal property and contractual rights." To that end, Plaintiffs allege that "Davis and Agarwal began meeting in secret telephonically and communicated via email without cc'ing Plaintiffs to discuss the potential acquisition of [the Benuvia assets] by Agarwal from Benuvia Holdings after a default by Benuvia on the Secured Note," despite instructions from Plaintiffs "that such communications were prohibited by Plaintiffs and that Agarwal did not have authority to negotiate or execute such transactions." And throughout this period, Plaintiffs allege that Davis "traveled to and from Texas," "conducted regular phone calls and email correspondence to the employees of Benuvia in Round Rock, Texas[,] and recruited and hired personnel to work at the company locations in Round Rock, Texas."

These allegations are sufficient to meet Plaintiffs' initial burden to bring Davis within the reach of Texas's long-arm statute. *See* Tex. Civ. Prac. & Rem. Code § 17.042; *Moncrief*

12

*Oil*, 414 S.W.3d at 149 (concluding plaintiff's allegations that defendants committed torts in Texas by misappropriating alleged trade secrets at Texas meetings sufficient to meet initial burden); *Lombardo v. Bhattacharyya*, 437 S.W.3d 658, 679 (Tex. App.—Dallas 2014, pet. denied) (determining plaintiff's allegations that defendants "conducted ongoing business operations" and committed torts in Texas sufficient to satisfy initial burden).

Because Plaintiffs carried their initial pleading burden, the burden shifted to Davis to negate the alleged jurisdictional bases. *See Kelly*, 301 S.W.3d at 658. Davis attached a declaration to his special appearance in which he avers, among other things, that:

- He has never lived or maintained an office in Texas.

- He has never worked for a Texas company, been a limited or general partner of a Texas partnership, or been a member of any Texas professional organization.

- He has never paid or owed any taxes in Texas, nor has he owned any assets in Texas, including owning, leasing, renting, or controlling any real or personal property in Texas.

- He has never held or maintained any stock, securities, negotiable instruments, commercial paper, brokerage accounts, or bank accounts in Texas.

- He has never applied for or received any loan, line of credit, or similar funding in Texas.

- He has never provided business services to a Texas customer, solicited a Texas customer, or solicited customers while in Texas. To the extent that he sought the services of a person or entity in Texas, it was in his capacity as an officer for the sole purpose of facilitating the sale and operations of Benuvia Manufacturing, Inc. or Benuvia Therapeutics, LLC.

- When communicating with Agarwal, he was unaware of Agarwal's location at the time, unless Agarwal volunteered such information during the conversation.

- On February 25, 2022, he participated in a call with Agarwal and others to discuss a range of business topics, none of which related to the acquisition of the Benuvia assets.

13

- He never owned Benuvia Manufacturing, Inc. or Benuvia Therapeutics, LLC, nor did he manage or direct employees of either entity.

- He was an officer of Benuvia Manufacturing, Inc. and Benuvia Therapeutics, LLC before Next Frontier's December 2021 acquisition of the entities, when he resigned from those positions. He has not since resumed those positions.

- He never loaned any money to Next Frontier or Benuvia, Inc.

- He has never traveled to Texas in his personal or individual capacity.

Davis lists the following seven business trips to Texas that he recalls taking over the last ten years:

- Traveled to Round Rock between July 5-6, 2021, in his capacity as an officer of Benuvia Manufacturing, Inc. and Benuvia Therapeutics, LLC to visit the entities' facility, attend meetings to receive updates on the operations, and tour the plant to prepare for the entities' sale.

- Traveled to Austin and Round Rock between September 25-28, 2021, in his capacities as (1) an officer of an entity unrelated to this case to attend meetings unrelated to the subject-matter of this case and (2) an officer of Benuvia Manufacturing, Inc. and Benuvia Therapeutics, LLC to attend meetings related to the entities' sale.

- Traveled to Round Rock between October 19-21, 2021, in his capacities as (1) an officer of an entity unrelated to this case to attend meetings unrelated to the subject-matter of this case and (2) an officer of Benuvia Manufacturing, Inc. and Benuvia Therapeutics, LLC to attend one meeting related to the entities' sale.

- Traveled to Round Rock between December 6-8, 2021, to facilitate the final elements of the Benuvia acquisition.

- Traveled to Round Rock between September 11-13, 2022, in his capacity as an officer of Benuvia Intermediate Holdings, LLC to attend business-development meetings and review business operations at the facilities.

- Traveled to Round Rock between September 25-28, 2022, in his capacities as (1) an officer of an entity unrelated to this case to attend meetings unrelated to the subject-matter of this case and (2) an officer of Benuvia Intermediate Holdings, LLC to receive an update on the status of operations at the facilities.

14

- Traveled to Round Rock between November 14-15, 2022, in his capacity as an officer of Benuvia Intermediate Holdings, LLC to receive an update on the status of operations at the facilities.

Plaintiffs maintain that Davis failed to negate all bases for personal jurisdiction, namely because he "never disclaims participation" "in a fraudulent scheme involving the sale and reacquisition of [the Benuvia assets]." Specifically, Plaintiffs point out that Davis does not deny that "he was intimately involved with the Benuvia Acquisition" and in fact notes several trips related to the sale and operations of the Round Rock facility. Plaintiffs also highlight that Davis does not deny both that he had been instructed not to communicate with Agarwal regarding Benuvia's financial matters and that he "frequently communicated" with Agarwal, including conversations "tethered to a plot involving Texas real property." And because Davis does not deny knowing that Agarwal was based in Austin, Plaintiffs maintain that the trial court could have reasonably concluded that Davis knew he was reaching out to Texas by initiating these conversations with Agarwal. Plaintiffs also contend that Davis failed to deny that he had an economic interest in, or otherwise sought to reap the benefits of, the Round Rock-based facility and operations.

But even assuming that Davis did negate all potential bases for jurisdiction invoked by the pleadings, Plaintiffs responded to Davis's special appearance with evidence affirming the allegations in the petition sufficient to establish specific jurisdiction. In opposing Davis's special appearance, Plaintiffs included in their response a declaration from Soqui (Next Frontier's executive chairman and a member of Benuvia's board of directors) that supported the allegations in their petition. Soqui attested that he was "directly involved" in the Benuvia acquisition and remained involved in the business operations and transactions forming the basis for this lawsuit.

15

Among other things, Soqui stated that after the acquisition, all defendants "made continual contact with Texas to operate and maintain these businesses and maintained control of all of the operating and funding accounts." Soqui also stated:

> Unbeknownst to myself and Plaintiffs, beginning in January 2022, Todd Davis, Muna Said and Shiraz Noor began to collaborate with Agarwal and Martin to acquire Benuvia back from Next Frontier Holdings and to complete several related party banking transactions with Agarwal that were not approved by the Benuvia Board and were against expressed instructions from Plaintiffs not to complete such transactions.[5]

Despite Next Frontier's instructions that Benuvia Holdings should not discuss potential restructuring of the note or other financial matters with Agarwal, however, Soqui maintained that "Davis and Agarwal began meeting in secret telephonically and communicated via email without cc'ing Plaintiffs to discuss the potential acquisition of [the Benuvia assets] by Agarwal from Benuvia Holdings after a default by Benuvia on the Secured Note." Though Soqui acknowledged that "Davis was out-of-state for some of these meetings and communications, Agarwal remained in Williamson and Travis Counties," which supports the trial court's implied finding that Davis knew Agarwal was in Texas for these conversations about the Benuvia assets located in Texas. Soqui also attested that "Davis and Benuvia Holdings continually reached out to Agarwal and Martin to scheme to take over the Benuvia Assets for their own benefit and obtain unauthorized and confidential business information about the Benuvia Assets and the company assets located in Texas."

In opposing Davis's special appearance, Plaintiffs also included various communications from Davis produced in the limited discovery period that they contend confirm

---

[5] In their petition, Plaintiffs specifically connect these transactions to the breach of fiduciary duty and knowing participation in breach of fiduciary duty claims.

16

his "significant involvement" with this scheme. For example, Plaintiffs cite to various communications between Davis and Agarwal (among others) after the Benuvia acquisition, which reflect that the two were meeting regarding topics including "Next Frontier" in late February 2022 (after Plaintiffs instructed Davis not to discuss financial matters with Agarwal) and "recapitalization strategy" in March. As to the latter, Soqui testified that Benuvia discovered a strategy document, which Plaintiffs attached in their response to Davis's special appearance, "that reflected purported reacquisition plans, in which Agarwal would acquire 80% of Benuvia and Davis would acquire an allocated amount of equity in Benuvia.

Under the applicable legal-and-factual-sufficiency standard of review, we conclude there is sufficient evidence to support the trial court's implied findings that Davis had the requisite minimum contacts with Texas to support the exercise of personal jurisdiction in this case. *See Leesboro Corp.*, 322 S.W.3d at 926–27; *Ennis*, 164 S.W.3d at 710. Though Davis disputes some of these allegations in the affidavit attached to his special appearance, we must presume that the trial court resolved all factual disputes in favor of its decision. *Enright*, 2016 WL 1048881, at *6.

We conclude that the evidence detailed above supports the trial court's implied finding that Davis purposefully availed himself of the forum because his contacts with Texas— e.g., his phone calls and other communications with Agarwal about the alleged scheme to reacquire the assets, when he knew Agarwal was in Texas—were Davis's own and not the unilateral conduct of another person; were purposeful and ongoing, not random, isolated, or fortuitous; and were taken in an effort by Davis to avail himself of the privilege of conducting business in Texas by establishing an ongoing relationship with the forum to benefit from business operations in the state. *See id.* at *7 (collecting cases); *see also Yong Zhang v. Med-Towel Enters.*, No. 03-09-00457-CV, 2010 WL 1404613, at *5 (Tex. App.—Austin Apr. 8, 2010, pet. denied) (mem. op.) (determining

17

trial court could reasonably choose to credit plaintiff's testimony that non-resident defendant purposefully availed himself of forum by initiating communications when he knew plaintiff was in Texas, discussing transaction in Texas, and conducting operations for Texas business); *Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 848–49 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (concluding trial court reasonably could have found non-resident defendant's two trips and multiple phone calls to Texas sufficient to establish "purposeful, and not random or fortuitous," forum contacts); *Glencoe Cap. Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 165 (Tex. App.—Fort Worth 2008, no pet.) (contrasting "one-time, unsolicited, fortuitous transaction between the seller and the Texas resident in *Michiana*" with "long-time, ongoing relationship" between non-resident defendants and Texas residents who defendants knew operated Texas-based businesses). The evidence also supports the trial court's implied finding that there is a substantial connection between Davis's forum contacts and the operative facts of the litigation, such that Davis's alleged liability relates to or arises from these contacts. *See Enright*, 2016 WL 1048881, at *7 (collecting cases).

Davis claims that his actions were performed in his representative capacity as an officer of Benuvia Holdings and thus cannot be imputed to him individually to support the exercise of personal jurisdiction. "But even if all of a corporate representative's actions are performed in his corporate capacity, the officer or member may also be subjected to personal jurisdiction and held liable in his individual capacity for those actions if they were tortious." *City of White Settlement v. Emmons*, No. 02-17-00358-CV, 2018 WL 4625823, at *15 (Tex. App.—Fort Worth Sept. 27, 2018, pet. denied) (mem. op.); *see Ennis*, 164 S.W.3d at 707 ("[A] corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or fraudulent conduct, directed at the

18

forum state, for which he may be held personally liable.").  Here, Plaintiffs' allegations of tortious conduct support the exercise of specific jurisdiction over Davis because Davis's forum contacts— specifically, his phone calls and other communications with Agarwal, knowing that Agarwal was in Texas about the alleged scheme to acquire Benuvia's assets, which are located in Texas, in disregard of Benuvia's instruction not to discuss financial or capitalization matters with Agarwal —demonstrate purposeful availment and the alleged torts arise from or relate to these contacts. *See Furie Petroleum Co. v. Ben Barnes Grp., L.P.*, No. 03-14-00181-CV, 2015 WL 6459606, at \*5 (Tex. App.—Austin Oct. 23, 2015, no pet.) (mem. op.) (citing *Niehaus v. Cedar Bridge, Inc.*, 208 S.W.3d 575, 581 (Tex. App.—Austin 2006, no pet.)).

Finally, this is not one of the "rare occasions" in which the exercise of jurisdiction over a nonresident with minimum contacts fails to comport with traditional notions of fair play and substantial justice to preclude jurisdiction.  *See Cornerstone Healthcare*, 493 S.W.3d at 74; *Leesboro Corp.*, 322 S.W.3d at 930 (noting that if non-resident corporate-officer defendant "committed a tort in Texas, the exercise of specific jurisdiction over him would not normally offend traditional notions of fair play and substantial justice").  Courts consider the following relevant factors, where appropriate, in the analysis:

> (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies.

*Cornerstone Healthcare*, 493 S.W.3d at 74.

Here, Davis has not made a "compelling case" that jurisdiction is "unreasonable." *See TV Azteca v. Ruiz*, 490 S.W.3d 29, 55 (Tex. 2016) (quoting *Spir Star AG v. Kimich*, 310 S.W.3d

19

868, 878–79 (Tex. 2010)). Benuvia Holdings is litigating the underlying suit in Texas after dismissing its interlocutory appeal of the trial court's order denying its special appearance. The trial court could have reasonably concluded that any added burden on Davis—who is the manager of Benuvia Holdings—is relatively minimal and does not outweigh Texas's interest in adjudicating a dispute involving the alleged tortious activity surrounding the acquisition of Texas-based real property and subsequent operations of its business. *See Cornerstone Healthcare*, 493 S.W.3d at 74; *Bunting v. Kyle Bunting Holdings, Inc.*, No. 03-18-00656-CV, 2019 WL 2622318, at *6 (Tex. App.—Austin June 27, 2019, pet. denied) (mem. op.) (recognizing Texas's "manifest interest" in providing forum for redressing injuries inflicted by non-resident actors (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 43 (1985))). And litigating claims arising out of the same facts against co-defendants promotes judicial economy. *See Cornerstone Healthcare*, 493 S.W.3d at 74 (citing *Moncrief Oil*, 414 S.W.3d at 155). Thus, weighing all the relevant factors, we conclude that exercising personal jurisdiction over Davis comports with traditional notions of fair play and substantial justice.

## CONCLUSION

We hold that the trial court did not err in denying Davis's special appearance and affirm the trial court's order.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed: April 29, 2025

20